(No. 21017.—

THE PEOPLE OF THE STATE OF ILLINOIS *et al.* Appellees, *vs.*
THE DIME SAVINGS BANK *et al.*—(HARRY CUERDEN,
Receiver, Appellant.)

*Opinion filed December 23, 1932.*

504

ORR, J., took no part.

MACK & MACK, and BRYAN H. TIVNEN, (THOMAS R. FIGENBAUM, and CARUS S. ICENOGLE, of counsel,) for appellant.

Homer H. Williams, State's Attorney, Charles J. Scofield, and Apollos W. O'Harra, for appellees.

Mr. Justice Dunn delivered the opinion of the court:

The Dime Savings Bank, at Carthage, was incorporated under the Banking law of Illinois in 1906 with a capital of $50,000 and engaged in the banking business and continued to carry it on until April 24, 1930, when it suspended business and its assets were taken into the possession of the Auditor of Public Accounts, who appointed a receiver and later filed a bill in the circuit court of Hancock county for a settlement of the business of the bank and a dissolution of the corporation. This bill prayed for the appointment, as receiver, of Harry Cuerden, the same person whom the Auditor had appointed receiver after taking possession of the assets of the bank, and the court did accordingly appoint Cuerden as receiver.

James E. Crum was elected county treasurer of Hancock county in December, 1926, and served as county treasurer and *ex-officio* county collector for four years, until December, 1930. As county collector he collected the taxes for the year 1929, beginning February 28, 1930, and deposited the taxes collected in the various banks of the county, including the Dime Savings Bank. His account in the Dime Savings Bank was kept under the name of James E. Crum, county treasurer, and the amount of that account at the time the Auditor took possession of the bank was $67,-264.53. The treasurer presented to the receiver a claim for that amount as a preferred claim entitled to priority of payment over all other creditors of the bank, except such creditors, if any, as might have prior specific liens on all or some part of the assets of the bank. The receiver refused to recognize the priority of the claim, and thereupon, on November 14, 1930, a bill was filed in the name of the People and of James E. Crum, individually and as county treasurer and *ex-officio* county collector of Hancock county,

praying for an order requiring the receiver to pay the amount of the account as a preferred claim having priority over all creditors of the bank except those, if any, having specific liens. The bank and the receiver were made defendants to the bill and filed separate answers admitting the incorporation of the bank and its transaction of business at Carthage until it suspended business and was closed on April 24, 1930, and the election of Crum as county treasurer, but denying that he proceeded to collect the taxes levied and assessed for the year 1929 or that he deposited the taxes collected by him as collector in different banks in Hancock county, among which was the defendant the Dime Savings Bank, and denying that in making deposits in the Dime Savings Bank he caused to be made a deposit slip in duplicate, the original of which was taken, with the deposit, to the bank and a carbon copy of which was retained in the office of the collector showing on the face the deposit as made by James E. Crum, county collector, thereby informing the bank officers and persons receiving deposits that the deposits were made by Crum as county collector, and denying that when the deposits were made the officers and directors of the bank knew and understood that the deposits represented taxes collected by Crum as collector of the taxes levied and assessed for the year 1929, and that the taxes had not been distributed by the county collector and were deposited until such time as the county collector should be ready to make distribution of the taxes so collected. By leave of court an amended and supplemental bill was afterwards filed showing the expiration of the term of James E. Crum as county treasurer and the election and qualification of Albert Salisbury as his successor, and he was permitted to enter his appearance in his official capacity and join as a complainant in the bill. Upon a hearing by the court upon the pleadings, exhibits and oral testimony taken in open court, a decree was entered by the court in favor of the complainants, finding that when the bank sus-

pended business there was on deposit in the bank $67,264.53 taxes levied and assessed for the year 1929, collected by Crum as county collector, the property of the State of Illinois, held by it until distribution should be made, for the payment of which the People of the State of Illinois and Crum as county collector were entitled to a preference and priority of payment over the general creditors of the bank not having specific liens, and accordingly ordering that the receiver pay to Salisbury, the successor of Crum, as county collector, in due course of the receivership and the settlement of the affairs of the bank and from time to time as property and assets of the bank were available for that purpose, the sum of $67,264.53, or so much thereof as the property and assets of the bank would pay after the payment of the costs of receivership and the established specific liens, if any such liens existed. The receiver has appealed from this decree.

The rule announced in *People* v. *Farmers State Bank,* 335 Ill. 617, that a debt owing to the State is entitled to priority of payment over all other creditors out of the debtor's property, has been followed in the decisions of later cases and is not questioned. The contest in this case is over the sufficiency of the evidence to sustain the decree. The contentions of the appellant are, that the evidence fails to show that taxes remained on deposit in the defunct bank; that the taxes deposited remained undistributed; the amount of undistributed taxes on deposit, the insolvency of the bank. In respect to the last item it is stated that insolvency was neither alleged nor proved. Neither allegation nor proof was necessary. The purpose of the bill was to obtain an adjudication of the claim of the complainants to share in the distribution of the assets of the bank in the hands of the receiver and a decree for a preference in its payment. The bill was against the bank and its receiver appointed by the Auditor under the Banking act and by the court in a suit by the Auditor for winding up the affairs of the bank,

distributing the assets among its creditors and stockholders and dissolving the corporation. Section 11 of the Banking act provides for the appointment of a receiver by the Auditor and for a review of such appointment by the circuit court of Sangamon county, upon application of the bank, within ten days, for an injunction against further proceedings. The propriety of the appointment by the Auditor can not be otherwise questioned, and the decree of the court is not subject to collateral attack by the receiver appointed by it, or by the bank, in a proceeding by a creditor to enforce his claim against the receiver.

It was shown by the evidence that Crum, as county collector, began the collection of the taxes of 1929 in 1930 and deposited the sums collected in different banks in Hancock county. He had an account in the Dime Savings Bank which was kept under the title "J. E. Crum, County Treas.," the amount of which on the morning of February 28, 1930, was $4009.79. This was not undistributed taxes, except, possibly, the sum of $54.44. On that day he deposited the further sum of $703.51, which was taxes collected, and afterward, from time to time, deposited other taxes collected, the last deposit being on April 22, 1930. All these deposits were credited to the account of Crum, treasurer, and the amount of the account when the bank was taken into the possession of the Auditor was $67,264.53. Each of the deposits was accompanied by a deposit ticket with the heading, "Deposited in the Dime Savings Bank, Carthage, Ill., * * * by J. E. Crum, Co. Coll.," which, except in one or two instances to be noticed later, was made in duplicate by Miss Sympson, a deputy of the treasurer, the original being delivered to the teller of the bank with the deposit while the carbon copy was retained in the treasurer's office. These deposits amounted to $88,113.88, and were all entered, as made, in a pass-book of the Dime Savings Bank in the name of "J. E. Crum, Co. Treas.," by the officers or employees of the bank.

The appellant insists that the evidence does not justify, legally, the conclusion that the deposits were of taxes collected. His counsel argue the collector would naturally produce in evidence the copies of the tax receipts, which section 155 of the Revenue act required him to prepare in triplicate and keep a copy of in his office, and the collector's book showing each payment of taxes in detail, and yet none of these records were introduced in evidence. It was not necessary that every payment of taxes by the individual tax-payers should be proved. It was enough to prove payment of taxes to the amount that taxes were paid, and it was not necessary to prove the payment by the copies of the receipts issued or the entry in the collector's book. They were proved by the testimony of Miss Sympson, who was the deputy treasurer and kept the book in which the daily entries were made of taxes collected each day and of the deposits made of those taxes. Several others in the office received taxes, which were put in the cash drawer, and Miss Sympson looked after the money and made the deposits in the Dime Savings Bank. She made up the deposit tickets and sometimes took the deposits to the bank. Sometimes they were taken by one of the others. It was not necessary to show who the tax-payers were who paid these taxes, or any of them. Crum was admitted to be the collector. He had the collector's books. He was in the treasurer's office for the collection of taxes. Persons came there to pay, and he received certain sums as taxes himself and through his deputies and employees. All these things were proved by competent evidence. If any irregularities or errors existed in the payment or receipt of the taxes it did not concern the bank. It received as taxes the money deposited in the name of the county collector. The deposits were the property of the State, and the only duty of the bank in regard to them was to pay them, on the order of the collector, the agent of the State for their collection, to the proper officers of the State or of the political subdivisions of the State en-

titled to them or to another depositary. The receipt of the taxes was as properly proved by oral testimony as by an entry in a book or by a receipt, and Miss Sympson's testimony was that each day's deposit was made from the taxes collected.

The complainants' exhibit 46 was pages 76 to 115, inclusive, of a book called the day book, kept in the treasurer's office, in which entries were made by Miss Sympson of the amount of taxes collected each day. The entries on these pages also show, in Miss Sympson's handwriting, the deposits of taxes made from day to day. The entries were made, as Miss Sympson testified, on the days stated in the book. The appellant objected to the offer of the book on the ground that it was not a book of original entry and that it was not a record of the office but a mere private record or memorandum kept by Crum. The book was shown to be one of original entry. Several persons besides Miss Sympson and Crum were in the office engaged in receiving taxes. Each tax-payer brought with him the duplicate tax receipt on yellow paper which had been sent to him by the county collector, or if he did not bring the duplicate receipt which had been sent to him, an extra copy was made out at the time the payment was made, in lieu of the one the tax-payer forgot to bring. These documents, whether duplicate originals or copies made at the time the taxes were paid, were retained in the collector's office and were introduced in evidence at the hearing. The separate items of taxes were not entered in any book, but the amounts received, whether in money or checks, were placed in the money drawer, and at the end of each day the total of the tax collection for the day was entered in the book. Neither the items nor the totals were copied from any other book but the amounts were taken from the duplicate statements returned by the tax-payers when they paid their taxes or the copies made at that time of those which were not returned, which, as Miss Sympson testified, had to correspond with the receipts

written that day. The rule in regard to the admission of books of account requires them to be books of original entry and not books to which the entries have been transferred from another book, but it is no objection to the books, if otherwise regular, that the entries which they contain were first made temporarily, for convenience, upon a slate or on slips of paper or other memoranda, or even on a blotter, and the same day transferred to the journal or other book of original entry. (2 Jones on Evidence, sec. 584.) When books are shown to be the only books kept by a person, the proof is sufficient that they were books of original entry. *Patrick* v. *Jack,* 82 Ill. 81.

The further objection was made that this book was kept by Crum as a private record. He testified that the book which was introduced in evidence as exhibit 46 was the day book, in which was entered the amount of taxes collected each day that went into the bank every day. In the back of the book were entered three years' taxes, and the book is one of the records of the office. The book was kept by Miss Sympson and nearly all the entries were in her handwriting. The entries refer to taxes collected and the banks in which they were deposited. The book shows the deposits made in more than twenty banks. Miss Sympson stated in her testimony that it was a private book, but the manner of its use and the purpose of keeping it show that it was an official record of the transactions of the treasurer in the business of the collection of taxes, and it was properly admitted in evidence. To entitle a book to the character of an official register it is not necessary that it be required by an express statute to be kept nor that the nature of the office should render the book indispensable. It is sufficient that it be directed by the proper authority to be kept and that it be kept according to such directions. (1 Greenleaf on Evidence, sec. 496.) Whenever a written record of the transactions of a public officer in his office is a convenient and appropriate mode of discharging the duties of the office

it is his duty to keep that record whether required by law so to do or not, and such a record is a public record belonging to the public and not to the officer. *Coleman* v. *Commonwealth,* 26 Gratt. 865.

In addition to the deposits accompanied by a deposit ticket made out in the name of J. E. Crum, county collector, there were five other deposits, as follows: On February 28, $153.75; March 1, $40; March 1, $85.72; April 4, $20; April 21, $5000. These amount to $5299.47, making the total amount deposited in the treasurer's account from February 28, 1930, to April 22, 1930, both dates inclusive, $93,413.35, to which must be added the credit balance of $4009.79 on February 28. The credit side of the account amounted to $97,423.14, against which were charged payments of $30,158.61, leaving a balance of $67,264.53, for which the appellees claim a preference of payment. Each of the five deposits, amounting to $5299.47, was accompanied by a deposit ticket in the name of J. E. Crum, county treasurer. In the case of the $5000 deposit the ticket contained the single item $5000, before which was the word "Marine," and the treasurer's testimony was that the transaction was a transfer from the Marine Trust Company. Of the $30,158.69 paid out of the treasurer's account on his order the sum of $10,907.69 was paid on account of county orders, jurors' certificates and other county purposes, and the remainder, $19,250.82, on account of taxes. Objection is made to several of the deposits that they are not shown by the evidence to be deposits of taxes. The first of these is the deposit of $153.75 on February 28, which is not shown as a deposit of tax collections on the day book, for which no deposit duplicate ticket was produced, but which appears as a credit in the treasurer's account and for which the appellees produced a deposit ticket in the name of J. E. Crum, county treasurer. Next are the deposits of $40 on March 1 and $20 on April 4, each with a corresponding deposit ticket in the name of J. E. Crum, county treasurer,

concerning which the appellees offered no evidence. Another deposit is the $85.72 deposited March 1 with a deposit ticket of J. E. Crum, county treasurer, about which the appellees offered no evidence. The $5000 deposit of April 21 was shown to be a transfer of cash from the Marine Trust Company.

Objection is also made to the deposits of $358.61 on March 1 and $3072.28 on March 31. These deposits appear in the day book. The original deposit ticket for the first, produced by the appellant, is defendants' exhibit 401 and has at its head "J. E. Crum, Co. Treas.," and no date, while the supposed duplicate produced from the treasurer's office is complainants' exhibit 105 and has at its head "J. E. Crum, Co. Coll.," and the date March 1, 1930. The original ticket for the other deposit, also produced by the appellant, is defendants' exhibit 403 and has at its head "J. E. Crum, Co. Treas.," with the date March 31, 1930, while the supposed duplicate from the treasurer's office is complainants' exhibit 106 and has at its head "J. E. Crum, Co. Coll.," and the same date. Concerning these tickets Miss Sympson testified that the figures on defendants' exhibit 403 were her figures. "J. E. Crum, Co. Treas.," written at the top, is the handwriting of Miss Grace Kunkel, who was employed at the Dime Savings Bank. The amounts listed were tax collections. The handwriting of exhibit 106 is all Miss Sympson's. Miss Sympson did not take the money to the bank, but she remembered the occasion and that Miss Kunkel called her and told her she did not have the name at the top of the ticket. Miss Sympson said she would come over and put it in, but Miss Kunkel said, "You put it in the duplicate and I will put it in the original," and that is what happened. In regard to exhibits 401 and 105 Miss Sympson testified that both were in her handwriting and were made at the same time. She could not tell why one was county treasurer and the other county collector. She supposed she made them at the same time. They were the same

except the word "collector" in exhibit 105 instead of "treasurer" in exhibit 401. She found her error, changed "treasurer" to "collector" in the duplicate and failed to change the original. She testified that she did not remember having done that, but she must have corrected it about the time she made defendants' exhibit 401. This testimony seems to be a reasonable explanation of the discrepancies between the supposed originals and duplicates in these two cases and to establish the deposit of the respective amounts of taxes in the bank.

The five items above mentioned, amounting to $5299.47, are not shown by the evidence to be taxes. As to the four smaller items there is nothing in the evidence indicating the source from which they were derived. The day book showing the tax collections and deposits has an entry of $5000 deposited on April 21, and this would indicate a deposit of taxes, but the deposit ticket is in the name of J. E. Crum, county treasurer, and bears the notation "Marine," and the treasurer testifies the deposit was a transfer from the Marine Trust Company. There is no evidence, however, to show that it was a transfer of taxes from the Marine Trust Company to the Dime Savings Bank, and for all that appears in the evidence the money may have come from another source entirely apart from tax collections. Therefore this amount of $5299.47 must be regarded as a part of the general fund of the county available for county purposes. The total amount of the funds available for county purposes in the Dime Savings Bank, including the balance on February 28, was $9309.26, while the amounts paid out for such purposes, $10,907.69, created a deficit of $1598.43. Deduction of the $5299.47 deposited in the treasurer's account between February 28 and April 22, not shown to be taxes from the gross amount deposited, reduces the amount of taxes on deposit to $88,113.88. This amount is reduced by the payments made on account of taxes, $19,250.82, to $68,863.06, which is $1598.53 more than the $67,264.53

balance remaining in the account. The discrepancy of ten cents between this amount and the $1598.43 above mentioned as the deficit arises from the fact that on March 24 a deposit was made of a single check for $805.17 and that amount was credited to the treasurer's account, but the amount of this deposit was entered in the day book in the treasurer's office showing tax collections deposited, as. $805.07, only.

The appellant claims that the money in the bank, even if tax money, is not undistributed tax money but has within the meaning of the law been distributed. He insists that the distribution referred to in *People* v. *Farmers State Bank,* 335 Ill. 617, is limited by *People* v. *Farmers State Bank,* 338 Ill. 134, and does not require actual payment to the various political subdivisions of the State by which the tax was levied and which are entitled to receive it when collected, but that any act of the treasurer in segregating, separating, dividing and apportioning the tax money on his books and records to the various political subdivisions amounts to a full and complete distribution. The argument is based on the following language contained in the opinion in *People* v. *Farmers State Bank,* 338 Ill. 134, on page 143: "That case, [335 Ill. 617,] under the facts stated in the opinion of the court, is authority for the proposition that money paid and collected for taxes is the property of the State until distribution thereof to the various municipalities and political subdivisions. However, we are not disposed to extend that doctrine and make it applicable to tax money or alleged public funds which have been segregated, separated or delivered to the proper representative or custodian of each and every minute political subdivision or unit of the State, county or other municipality." It will be observed that in the case in which this language was used a township school treasurer was claiming a preference over other creditors in the payment, out of the funds of a bank in the hands of a receiver, of his claim for school money

which he had deposited in the bank. The deposit, so far as it consisted of school taxes, was of taxes actually paid over to the school treasurer, who was the proper officer to receive them, and the decision is no authority that any bookkeeping entry or entries in the record of the county collector, without payment to the proper officer or officers of the political subdivisions levying the taxes, will be equivalent to an actual distribution of the taxes and will destroy the right of the State to a preference of payment of the debt of a bank for money actually deposited with it and not re-paid. The case of *People* v. *Bank of Chebanse,* 340 Ill. 124, is authority that when funds pass into the hands of the treasurer as county funds the treasurer is not entitled to a preference over other depositors as to such funds deposited in an insolvent bank.

The primary definition of "distribute" as given in Funk & Wagnall's Standard Dictionary is, "To give out or divide among a number; share or parcel out; allot; dispense; apportion; as, to distribute alms;" and Webster's Dictionary defines it as, "To divide among several or many; deal out; apportion; allot." Entries in a book may serve as a memorandum of a distribution to be made or evidence of a distribution made, and with such meaning may be referred to as a distribution, but the actual distribution of tangible things involves the notion both of separation or division and delivery. A mere separation of entries in a book of a sum into the constituent items composing it is in one sense a distribution, but it is not in that sense that a distribution of money or property or taxes to those interested in them is thought of. Such a distribution involves a delivery of the money, property or taxes concerned, to the persons entitled to them. No evidence of any such distribution of the taxes deposited in the Dime Savings Bank was produced.

It does appear from the testimony of the treasurer and the collector's distribution book which was introduced in evidence by the appellant, that the total amount of taxes

extended in the county was over a million dollars and the total tax collected was $1,037,706.39. A distribution of twenty-five per cent of the total amount of the taxes was made before April 24. The distribution book did not disclose anything about the payment to the State or county of the respective amounts due them on account of the distribution of the twenty-five per cent. The amount paid the State was otherwise shown to be $39,907.34. The county tax levied was $154,035.72, twenty-five per cent of which is $38,508.92. The treasurer testified that the reason he did not put the figures showing this payment in the book was that he considered the balance of the twenty-five per cent went to Hancock county, and that he considered in the course of business that the county also took the same per cent of distribution at that time whether it shows on the book or not. The meaning of this statement is that the remainder of the twenty-five per cent of all the taxes distributed, after paying all the other taxing bodies the amounts due them, belonged to Hancock county. The account of the treasurer, as has been shown, consisted of taxes collected and other items belonging to the county derived from other sources. The responsibility of keeping his accounts so as to distinguish between these two classes of items, taxes collected and money in his custody belonging to the county derived from other sources than taxes, was therefore upon the treasurer. As county treasurer he was the custodian of the funds of the county belonging to it as a quasi-public corporation and a political subdivision of the State, and no preference existed for such funds deposited by him in a bank over other creditors of the bank. For undistributed taxes held by him as county collector a preference did exist in favor of the State. The treasurer was *ex-officio* collector, but the rights and liabilities because of these two relations were distinct, and it was his duty to keep his accounts so that these respective rights and liabilities could be distinguished.

The treasurer was right in his conclusion that when he made a distribution of twenty-five per cent of taxes which he had collected as county collector "the balance went to Hancock county." The funds in his bank account stood in his name as county treasurer, though at the time of the bank's suspension those funds were derived wholly from tax collections. He was in the habit of drawing against this account for the conduct of the affairs and business of the county, and the fact that he undertook to make a distribution of twenty-five per cent and paid that proportion of the taxes levied by all the other taxing districts in the county to their proper officers, respectively, leaving the amount due the county in his account as county treasurer subject to his check as treasurer for any county purposes, amounted to a transfer and distribution to the county of so much of the account as was equal to twenty-five per cent of the tax levied by the county. The first $1598.53 of the amount so distributed, however, will go to make good the deficit in the tax collector's account occasioned by the draft on it, which has been heretofore mentioned, for the payment of general county expenses. The amount of undistributed taxes would then be the difference between $68,-862.06 and the amount distributed to the county.

The decree is reversed and the cause is remanded to the circuit court of Hancock county, with directions to enter a decree that the receiver pay to the county treasurer and *ex-officio* county collector of Hancock county, as undistributed taxes, $30,353.14, or so much thereof as the property and assets of said bank will pay after paying the costs of the receivership and established specific liens, if any, and that he pay to the county treasurer of Hancock county for the use of said county the further sum of $36,911.39 in due course of administration of the assets of said bank, and that he pay the costs in due course of administration.

*Reversed and remanded, with directions.*

Mr. Justice Orr took no part in this decision.