City National Bank and Trust Company and Central Republic Trust Company, Appellants, v. Hubert Burnham, Appellee.

Gen. No. 39,691.

212

Heard in the second division of this court for the first district at the October term, 1937. Opinion filed November 17, 1938. Rehearing denied December 7, 1938.

BELL, BOYD & MARSHALL, of Chicago, for appellants; THOMAS L. MARSHALL, DAVID A. WATTS and VICTOR M. HARDING, JR., all of Chicago, of counsel.

SONNENSCHEIN, BERKSON, LAUTMANN, LEVINSON & MORSE, of Chicago, for appellee; ISAAC E. FERGUSON,

CHARLES E. ZEKAS and HOMER KRIPKE, all of Chicago, of counsel.

MR. PRESIDING JUSTICE FRIEND delivered the opinion of the court.

Plaintiffs brought four law suits upon an instrument of guaranty by which thirteen individuals, including defendants Hubert Burnham, William H. Emery, Walter S. Ross and Daniel H. Burnham, severally guaranteed the principal, interest and carrying charges of a $1,600,000 real estate mortgage bond issue, of which $1,402,500 of bonds remain outstanding and in default. In each of the four cases, City National Bank & Trust Company, Chicago, trustee, was plaintiff, and Central Republic Trust Company, trustee, joined as alternative plaintiff. This case against Hubert Burnham, Gen. No. 39,691, was consolidated for hearing with causes numbered 39,692, 39,693 and 39,694 and they were tried before the court without a jury, resulting in judgment for the defendant in each case. Plaintiffs appealed from the several judgments and during the pendency of the appeals an order of consolidation was here entered in each case.

Although the record is quite voluminous, consisting principally of documents and writings, the evidence is not in conflict. It appears that some thirteen individuals, who later issued the bonds and guaranty herein, held an option to purchase from the Palmer estate the vacant unimproved lot south of the Palmolive building in Chicago, bounded by Michigan avenue, Delaware place and Chestnut street. This option was exercised on December 28, 1928, and title was taken by Chicago Title & Trust Company under a trust agreement of that date, described as No. 22114, Michigan, Delaware-Chestnut Realty Trust, which showed as beneficiaries thereof the individuals who later executed the bonds and guaranty sued on herein. Part of the

consideration for exercise of the option was obtained by temporary loan of $1,500,000 from Central Trust Company of Illinois, and the note evidencing the loan was signed by Chicago Title & Trust Company, as trustee, and not personally. A written several guaranty was affixed to the note, executed by the individual beneficiaries, who later executed the guaranty herein and in substantially the same percentages. Also December 28, 1928, an underwriting agreement was executed between Central Trust Company of Illinois and the trust, whereby the bank undertook to purchase, at 96½, the 6 per cent real estate mortgage bonds to be dated January 1, 1929, and payable January 1, 1932, in the aggregate amount of $1,600,000, the principal, interest and carrying charges to be severally guaranteed by the beneficiaries of the trust in the respective percentages later appearing upon the guaranty, which was executed when the bonds were issued. The trust deed, bonds and guaranty were executed and issued as contemporaneous documents January 1, 1929, and the underwriter paid the money upon the bonds after the executed guaranty had been delivered to the trustee and after each guarantor had furnished a written statement of his financial responsibility. The temporary note was paid from the proceeds of the underwriting, and the underwriter through its various group representatives sold the bonds to the public.

The bonds issued in the aggregate sum of $1,600,000, bearing interest at the rate of 6 per cent, dated January 1, 1929, and due three years thereafter, contained no provision for any sinking fund. They were executed by the Chicago Title & Trust Company, trustee, and expressly exempted the trustee and each beneficiary of the trust from liability upon the bonds, with only one exception, namely, that the guaranty should constitute an express assumption, to the extent thereof, of liability upon the bonds.

The material provisions of the guaranty, which refers in detail to the bonds, "this day executed," and to the mortgage securing them, reads as follows: "Now, Therefore, in consideration of the premises and of the purchase and acceptance of said bonds by the holders thereof, and for value received, each of the undersigned hereby severally and not jointly nor any one for the other, agrees to pay to Central Trust Company of Illinois, as trustee of an express trust for the benefit of the holders from time to time of said bonds, the proportion set opposite his name of the interest payable upon said bonds from time to time outstanding and of all taxes, assessments and other carrying charges as said term is defined in said mortgage deed of trust as and when the same become due and payable and each of the undersigned unconditionally waives all notice of non-payment or default, demand, presentment, protest or notice thereof and acceptance of this guaranty, and each accepts all of the provisions of said bonds and said mortgage deed of trust, and each authorizes the Mortgagor, without notice to him, to obtain any extension or extensions thereof, and each severally agrees in case of non-payment by him when due of his proportionate part of the payments so severally guaranteed, that suit therefore may be brought by Central Trust Company of Illinois, in its own name and as trustee of an express trust, as aforesaid, for the benefit of the holders of said bonds against him severally at the election of said Central Trust Company of Illinois, Trustee, whether or not suit has been commenced against the Mortgagor and that in any such suit the Mortgagor need not be joined, at the option of said Central Trust Company of Illinois, Trustee, and further severally agrees in the event of such suit, to pay the costs and reasonable attorneys' fees incurred by said Trustee therein. Said payment is severally guaranteed in the following proportions: . . ."

To this guaranty there were affixed thirteen signatures, including the four defendants, opposite whose names appear the following percentages of their undertaking: Walter S. Ross, 10 per cent; Daniel H. Burnham, 1⅔ per cent; Hubert Burnham, 1⅔ per cent; and William H. Emery, 2 per cent.

The guaranty then continues as follows: ''And for the considerations aforesaid, each of the undersigned severally and not jointly nor any one for the other agrees to pay to Central Trust Company of Illinois, as trustee of an express trust for the benefit of the holders from time to time of said bonds, the proportion set opposite his name, of the payment of the principal of said bonds outstanding and of all money payments other than interest, taxes, assessments and other carrying charges as above stated, as and when the same become due and payable and each of the undersigned unconditionally waives all notice of non-payment or default, demand, presentment, protest or notice thereof and acceptance of this guaranty, and each accepts all of the provisions of said bonds and said mortgage deed of trust, and each authorizes the Mortgagor, without notice to him, to obtain any extension or extensions thereof, and each severally agrees in case of non-payment by him when due of his proportionate part of the payments so severally guaranteed, that suit therefor may be brought by Central Trust Company of Illinois, in its own name and as trustee of an express trust, as aforesaid, for the benefit of the holders of said bonds against him severally at the election of said Central Trust Company of Illinois, Trustee, whether or not suit has been commenced against the Mortgagor and that in any such suit the Mortgagor need not be joined, at the option of Central Trust Company of Illinois, Trustee, and further severally agrees in the event of such suit, to pay the costs and reasonable attorneys' fees incurred by said Trustee therein. Said

payment is severally guaranteed in the following pro-
portions: . . . ." Affixed to the foregoing are eleven
signatures, including the four defendants, as follows:
Walter S. Ross, 30 per cent; Daniel H. Burnham, 1⅔
per cent; Hubert Burnham, 1⅔ per cent; and William
H. Emery, 2 per cent.

Interest and taxes were regularly paid through the
year 1931 as they became due, but in December, 1931,
it became apparent that although the interest would
be paid in January, 1932, principal then to become due
would not be paid, and Central Republic Bank & Trust
Company, a consolidation of Central Trust Company
of Illinois, and Chicago Trust Company, advised the
holders of bonds by letter of the impending default in
principal. A bondholders' committee was thereupon
organized and three individuals, Louis H. Schroeder,
Edward J. Costigan and Jay N. Whipple, assumed to
act as the committee. Schroeder was vice president of
Central Republic Company, Costigan was president
of the Whitaker Company of St. Louis, distributor of
$500,000 of the bonds, and Whipple was a member of
Bacon & Whipple, who had distributed some $200,000
of the bonds. They were interested because they had
sold the bonds to their customers, and served as a com-
mittee without compensation.

As a result of negotiations with Vincent Bendix, the
largest guarantor, a plan of reorganization was de-
vised and three documents, bearing date January 11,
1932, were drawn and executed in pursuance of the
plan, as follows: (1) A depositary agreement between
the committee and Central Republic Bank & Trust
Company, Depositary, Article 1 of which set forth the
plan of reorganization in detail; (2) a printed letter
from the committee to the bondholders, soliciting de-
posit of the bonds, requesting the bondholder upon
depositing his bonds to execute a document by which
he expressly consented to the depositary agreement

and plan of reorganization; and (3) a contract between the committee and Bendix, making the depositary agreement a part thereof and providing the mechanics for obtaining deposit of bonds, payment of expenses, etc.

In Article 1 of the depositary agreement, dated January 11, 1932, the plan of reorganization is outlined, as follows: That Bendix had at the outset paid the defaulted coupons and that he would pay the committee's expenses and also $160,000 for purchase and retirement of bonds as soon as the committee should declare the plan effective, as defined in section 8 of article 1; that the old bonds, which provided for no sinking fund, were to be exchanged for new bonds, providing a sinking fund of $720,000 to be used for retirement of bonds, to be paid in semiannual instalments of $80,000 each, commencing July 1, 1932, and efficacy was to be given to this provision by personal guaranty of the bonds by Bendix; that a new first mortgage and a new title guarantee policy were to be furnished, and Bendix, who was designated as the new guarantor, was personally to execute a written guaranty of principal, sinking fund, interest and carrying charges; that the old first mortgage and the old several guaranty were to be released and discharged when and if the new bonds, so secured by new mortgage and supported by the new guaranty, should be delivered to the depositary, after approval by the committee.

Pursuant to the execution of the depositary agreement on January 11, 1932, by the committee and the Central Republic Bank & Trust Company, the committee's printed letter of that date informed the bondholders of the salient features of the plan, and on the second and third pages of the letter, article 1 of the agreement was printed in full. It was suggested in the letter that copies of the entire depositary agreement were available to bondholders upon specific request. In pursuance of this letter the bondholders deposited

their bonds with the depositary, at the same time signing an acceptance of and consent to the provisions of the agreement.

The agreement of January 11, 1932, between the committee and Bendix, to which the depositary agreement was attached, contained various provisions similar to those of the depositary agreement, showing the difference between declaring the plan effective and consummating the plan or making it finally effective by the delivery of new bonds to the depositary, and providing that only upon the delivery of new bonds were the old mortgage and old guaranty to be released. Among the provisions of this agreement appear the following: "When and if the Committee shall declare the Plan effective subject only to the receipt of the new bonds as provided for in the depositary agreement, the new Guarantor agrees to deposit, within three days . . . an additional sum equivalent to one per cent of the aggregate principal amount. . . .

"In the event the Committee shall declare the Plan conditionally effective, the new Guarantor will deposit from time to time such further sums as shall be necessary to make available to the Committee sufficient funds for compensating dealers as aforesaid in connection with bonds deposited after the Plan shall be so declared conditionally effective, . . . shall not exceed three per cent of the aggregate principal amount of additional bonds so deposited.

"In the event the Plan shall be abandoned the Committee shall return to the new Guarantor any of such deposits not previously used or then required for the foregoing purposes. . . . If the Plan shall become finally effective, any of such deposits not required for the foregoing purposes shall likewise be returned to the new Guarantor.

"If the Plan shall not become finally operative the new Guarantor shall pay only the expenses and fees

aforesaid incurred in attempting to carry out the Plan. . . ."

Subsequently, on April 9, 1932, the committee wrote to Bendix, calling attention to section 3 of the depositary agreement, and requesting that he place with the depositary on or before April 15, 1932, $160,000, plus an additional $5,000 for the purpose as stated in section 3, and advising him as follows: "There have now been deposited with the Depositary more than 90 per cent of said First Mortgage Bonds issued and outstanding. Immediately upon the deposit with the Depositary of the aforementioned sums and the payment of the other expenses and liabilities of the Committee, in accordance with your previous agreements, the Committee will declare the plan conditionally effective as therein provided for. This notice and request is given in accordance with the terms of said Depositary Agreement and is not to be taken or construed as an amendment or waiver of any rights given the Committee by said Agreement or by the contract dated January 11, 1932, between you and the Committee."

At the same time the committee wrote a similar letter, requesting payment of various expenses undertaken by Bendix in the agreement of January 11, 1932. Apparently in response to these communications, Cassels, Potter & Bentley, on April 15, 1932, sent to Schroeder, chairman of the bondholders' committee, a check of Vincent Bendix for $164,578.99, and another check of Winston, Strawn & Shaw for $25,319.85, constituting payment of $160,000 and other items mentioned in the two letters of April 9. Following the receipt of these two checks, the committee, April 15, 1932, sent a letter to the bondholders, the material portions of which read as follows: "The Deposit Agreement dated January 11, 1932, containing the Plan of Reorganization with respect to the above Bonds, a part of which was sent to you with the Committee's communication of January 11, 1932, provides that the

Plan may be declared conditionally effective by the Committee when it, in its discretion, shall determine, subject to the conditions: (1) that not less than 90 per cent in amount of the Bonds shall have been deposited; (2) that $160,000 for the purchase of Certificates of Deposit, plus an additional sum sufficient to pay accrued interest at the rate of 6 per cent per annum upon Bonds represented by the Certificates purchased, shall have been deposited with the Depositary; and (3) that it shall then appear to the Committee that the other terms and conditions of the Plan will be carried out within a reasonable time.

"The Committee is pleased to inform you that at this date more than 90 per cent in amount of the Bonds have been deposited, and that there have been deposited with the Depositary the sums of money referred to above. It appears to the Committee that the other terms and conditions of the Plan will be carried out within a reasonable time, and the Committee has accordingly declared the Plan conditionally effective." The letter also outlined the mechanics of the tender of certificates of deposit by any bondholder who wished to sell, availing himself of the $160,000 fund for purchase of bonds. Considerable time elapsed after the letter of April 15, 1932, to the bondholders, during which the purchase of certificates of deposit and bonds was effected, and finally, November 12, 1932, the trustee formally canceled $197,500 of bonds so acquired, reducing the outstanding bond indebtedness to $1,402,500.

At a meeting of the committee, held May 23, 1932, Louis H. Schroeder, chairman, advised its members that of the $1,600,000 bonds outstanding, approximately $1,525,000 in amount had been deposited under the terms of the depositary agreement of January 11, 1932, and the plan of reorganization contained therein; that the conditions set forth in section 8 of article 1 of the depositary agreement had been fulfilled, that the terms of the plan could be carried out within a

reasonable time, and that in view of these facts it appeared for the best interests of the depositors to declare the plan effective. Mr. Costigan, another member of the committee, thereupon offered a resolution, which was unanimously adopted, the preamble of which recited that substantially more than 90% in amount of the outstanding bonds had been deposited under the terms of the agreement; that the conditions precedent to declaring the plan effective, as set forth in sec. 8 of Article 1 of the depositary agreement had been fulfilled, and that it appeared to the committee that the plan could be consummated within a reasonable time. It was therefore ''resolved, by the members of said Committee that the plan of reorganization set forth in Article 1 of said Depositary Agreement dated January 11, 1932, be, and it hereby is declared effective.'' A certified copy of the foregoing resolution was mailed to Messrs. Cassels, Potter & Bentley, attorneys for Bendix, May 24, 1932.

Subsequently, June 15, 1932, Bendix forwarded a letter to the committee, wherein he called attention to the plan for reorganization by which the principal for a new issue of bonds was to be guaranteed by him and which also provided that he was to pay on demand $160,000 cash for reduction of the old issue, and to make sinking fund payments in the amount of $80,000 every six months, beginning July 1, 1932. He said that unforeseen and serious changes for the worse had taken place since January, marked by a drastic decline in the market value of securities, seriously impairing the current liquid position of nearly everyone and that in view of the changed economic conditions he did not think the plan feasible and sound, and was therefore moved to propose that the issue be placed upon a sounder basis by eliminating the first four sinking fund payments and increasing the remaining payments to a total of $500,000, payable in semiannual instalments of $100,000, beginning July 1, 1934. He called

attention to the fact that he had already invested more than $730,000 in this enterprise, and was confident that if the plan were modified in the manner suggested in his letter, and otherwise remain unchanged, that the issue could be kept in good standing.

By letter of June 30, 1932, the committee passed on to the bondholders the information and proposal contained in Bendix's letter, and advised them that the interest due July 1 in accordance with the terms of the plan as outlined in the depositary agreement would not be available, for the following reasons: "Recently the Committee was advised by Mr. Vincent Bendix, the proposed new guarantor under the plan, that the plan could not be carried out without a modification of the sinking fund provision. The Committee has been in constant touch with Mr. Bendix and his representatives with reference to the proposed modification and hopes to be in a position within the next few days to give the bondholders additional information."

On the same day the committee advised Bendix that they would submit the proposed modification as outlined in his letter of June 15th to holders of certificates of deposit for their approval, upon conditions which may be summarized as follows: (1) that Bendix and Amos C. Miller (another guarantor) agree to place the mortgaged property in escrow, so that it will be readily available in the event of default; (2) Amos C. Miller to guarantee new bonds to the same extent that he was guarantor of the old bonds; (3) that the non-deposited bonds ($72,500) be acquired by Bendix and placed in escrow to be available for sinking fund; (4) that all expenses of the committee be paid prior to submitting the modified plan to holders of certificates of deposit; (5) that $270,000 of acceptance collateral be deposited by Bendix as security for his guaranty. Apparently these suggestions were not accepted by Bendix and no modified plan was then adopted between the committee and Bendix. Consequently no

proposal for modification of the original plan was then submitted to the bondholders.

Thereafter many conferences ensued and various suggestions were made for modification of the plan. As the matter stood at the close of June, 1932, there were no new bonds, no new mortgage, no new title guaranty policy, and no new guaranty, and the plan of reorganization provided in the depositary agreement of January 11, 1932, proceeded no further after Bendix's letter of June 15. On the old bonds which remained, there was a default in interest due July 1, 1932, and the status of the matter was continued until October 8, 1932, when a modified plan was adopted.

This modified plan was evidenced by an agreement, dated October 8, 1932, between the committee on the one hand, and Vincent Bendix and Amos C. Miller on the other, and was participated in by Edgar J. Uihlein, another guarantor. By letter of the same date the bondholders were informed by the committee of the detailed changes in the plan, and notified that any bondholder who did not acquiesce in the modifications was privileged to withdraw his bonds from the depositary. The material changes in the plan, as appearing from the committee's letter to the bondholders, may be summarized as follows: (1) the then outstanding bonds were to be extended, not refunded, for a period of five years from January 1, 1932; (2) Bendix was to agree to pay the principal and interest on all bonds, as well as taxes and other carrying charges when and as such payments should become due, if they were not otherwise made; (3) Edgar J. Uihlein was to be released of all his liability upon his guaranty, in consideration of substantial cash payments to be made by him at the time the plan, as proposed to be modified, should become finally effective; (4) Amos C. Miller was likewise to be released of liability upon his guaranty of interest payments and carrying charges, in

consideration of cash payments to be made by him at the time the plan, as modified, should become finally effective; (5) an agreement was to be entered into by Bendix and Miller, whereby Bendix would undertake to the extent of 93⅓ per cent and Miller to the extent of 6⅔ per cent, to pay to the trustee $80,000 on January 1, 1935, and a like amount each July and January first thereafter until and including July 1, 1936; such payments to be used by the trustee for the purchase of bonds in the open market, preference to be given to bonds offered at the lowest prices, and Miller should receive credit for any such payments made by him upon his guaranty of 6⅔ per cent of the principal of the bonds; (6) a provision reserving all rights against all the old guarantors, except as otherwise stated in the proposal. The committee's letter advised the bondholders that the effect of the plan with the proposed modification would give depositors extended bonds, with interest and carrying charges paid or provided for up to and including January 1, 1933; that the lien upon the mortgaged property would continue as theretofore, and no existing guaranties would be released except those of Uihlein and Miller; that in addition to the existing guaranties, and as further security for bondholders, there would be a guaranty by Bendix of all principal, interest and carrying charges, and that the bondholders would also have the benefit of the agreement of Bendix and Miller to provide regular semiannual payments from and after January 1, 1935, for the retirement of bonds.

The substantial cash payments by Uihlein, contemplated in the modified plan of October 8, 1932, in consideration for which he was to be released from his guaranty, were provided for in the agreement of that date, as follows: Bendix and Uihlein had made an agreement on September 30, 1932, whereby the latter was to advance to Bendix $150,000, part of which was

to be placed in escrow for the acquisition of the $72,500 bonds which had not been deposited with the depositary, and the balance to be available for performance of Bendix's commitment in the October 8, 1932, agreement, together with an additional $30,000 which Uihlein undertook to lend to Bendix.

The consideration by Miller for release of his guaranty of 6⅔ per cent of the interest and carrying charges was shown by the modified plan to be $9,466.67 cash.

The modified plan of October 8, 1932, provided for utilization of funds obtained, to pay $34,000 upon 1930 general taxes, July 1, 1932, and January 1, 1933, interest instalments, as well as costs and expenses.

With reference to the new guaranty to be furnished by Bendix, the agreement contained the following provision: "Such additional guaranty of Bendix shall be in the form of a guaranty of payment by the remaining old guarantors of their obligations when and as due, or a direct guaranty of the payment of the principal of, interest on, and carrying charges in connection with all of said bonds now outstanding, when and as due, or part in the former and part in the latter form, as shall be determined by the Committee, *but in any event is not to be, to any extent whatsoever, a substitution for any of the old guaranties none of which are to be released except as otherwise specifically provided hereunder or under the terms of the modified Plan.*" (Italics ours.)

The modified plan became effective November 15, 1932, when Central Republic Bank & Trust Company executed a formal release to Amos C. Miller of his guaranty of interest and carrying charges (but not releasing him from his guaranty of principal), the concluding paragraph of which reads as follows: "It is understood and agreed, however, that Ceneral Republic Bank & Trust Company, as Trustee, expressly retains

and reserves all rights which it or the holders from time to time of said bonds have or could have against all other parties who executed said guaranties, or either of them, except such of said parties as shall be expressly released by the Trustee." Also, on November 15, 1932, Central Republic Bank & Trust Company executed a similar document releasing Uihlein from his guaranty of principal, interest and carrying charges, and on the same date Vincent Bendix executed a full guaranty of principal, interest and carrying charges, the final paragraph of which reads as follows: "It is expressly understood that this guaranty of payment is given as additional security for the payment of the principal of, interest on and carrying charges with respect to said bonds and is not to be a substitution for any of the obligations of any other person or persons under any existing guaranties or agreements." At the same time an extension agreement was executed between Chicago Title & Trust Company, as trustee, and Central Republic Bank & Trust Company, as trustee, reciting the releases granted and providing that the bonds were extended from January 1, 1932, to January 1, 1937. Pursuant to the expressed provisions of the extension agreement, a legend, printed on each bond, stated that the maturity of the bond had been extended in accordance with the agreement, and that Edgar J. Uihlein had been and was released from his guaranty of the principal of and interest on the bonds and from his guaranty of all taxes, assessments and other carrying charges and of all other payments whatsoever; also that Amos C. Miller had been and was released of his guaranty of interest on the bonds and of all taxes, assessments and other carrying charges; and that "*the liability of all other guarantors has been and is expressly reserved.*" (Italics ours.) It also appears from the preamble of the extension agreement that Uihlein had

been released from all liability upon his guaranties with respect to the bonds and that Miller had likewise been released from all liability from his guaranty of interest and carrying charges with respect to the bonds, in consideration of the cash payments made by them respectively for the use and benefit of bondholders, and that these releases were given *"with express reservations of the rights against all other guarantors."* (Italics ours.)

November 21, 1932, the committee requested bondholders to present their certificates to the depositary and to withdraw the extended bonds, saying "we take pleasure in advising you that the plan, as modified in accordance with the terms of such letter, has now been declared finally effective." They were also told that there had been deposited with Central Republic Bank, as trustee, funds sufficient for payment of the July 1, 1932, and January 1, 1933, interest coupons, and that holders were at liberty to collect the same immediately. The bondholders' committee, consisting of Schroeder, Costigan and Whipple, thus ended its work and disbanded. However, another default occurred July 1, 1933, and thereupon, July 25, 1933, a second committee was organized, consisting of J. Sanford Otis and Edward J. Costigan. Later Charles Aaron joined the committee. A second depositary agreement was executed in July, 1933, but no further reorganization has been effectuated. Since July, 1933, substantial defaults have occurred in the payment of principal, interest and taxes.

In November, 1932, the Central Republic Bank & Trust Company changed its name to Central Republic Trust Company. In 1934 William L. O'Connell was appointed receiver of the Central Republic Trust Company, and in May, 1935, the trustee resigned its trust, effective August 5, 1935. The trust indenture provides that a successor trustee may be named by a ma-

jority in amount of the outstanding bonds. Following resignation of the trustee, the second bondholders' committee took title, under the depositary agreement, to the bonds then on deposit, and united with other groups and individuals holding bonds, in naming City National Bank & Trust Company as successor trustee. The latter accepted the trusteeship in September, 1935. April 3, 1936, the new trustee, in view of the interest defaults, aggregating approximately $250,000, and other defaults, accelerated the maturity of the principal and demanded payment thereof, and shortly thereafter instituted these proceedings. Upon the execution of an indemnity agreement by the committee to Central Republic Trust Company and its receiver, the latter, with authority from the receiver, joined as alternative plaintiff in each of the four suits.

From a summary sheet introduced in evidence it appears that March 1, 1937, the total interest on the defaulted bonds amounted to $409,147.50, total taxes in arrears $176,447.80, principal due $1,402,500, thus aggregating $1,988.095.30. After allowing credit for balance of cash in the hands of the trustee as of February 24, 1937, the liabilities of the four defendants for carrying charges were shown to be as follows: Walter S. Ross, at 10 per cent—$58,122.23; Daniel H. Burnham, at 1⅔ per cent—$9,686.65; Hubert Burnham, at 1⅔ per cent—$9,686.65; William H. Emery, at 2 per cent—$11,624.45. The liability of these four defendants for principal is indicated as follows: Walter S. Ross, at 30 per cent—$417,608.76; Daniel H. Burnham, at 1⅔ per cent—$23,200.48; Hubert Burnham, at 1⅔ per cent—$23,200.48; William H. Emery, at 2 per cent—$27,840.58. The total liability of these four defendants for carrying charges and principal is indicated as follows: Walter S. Ross—$475,730.99; Daniel H. Burnham—$32,887.13; Hubert Burnham—$32,887.13; William H. Emery—$39,465.03.

Defendants take the position that they were discharged as guarantors by force of the Committee-Bendix agreement of January 11, 1932, and the things done in performance thereof, and the court so held. The argument in support of this contention is based on the premise that the agreement of January 11, 1932, between the Committee and Bendix, gave defendants a third-party benefit which in effect released them from their old obligations as guarantors, and that after payment by Bendix of a substantial cash consideration under the agreement, and the performance by him of the promise upon which its effectiveness was conditioned, the third-party benefit under the agreement became vested. The fallacy of this argument, as we view it, is that the defendant guarantors were not parties to the agreement, but beneficiaries thereunder, and, as such, they were bound by the contract as written, and if the contracting parties, namely, the Committee and Bendix, had agreed that the old guarantors were not to be released until the plan was finally consummated by the delivery of new bonds, new guaranty and a new mortgage, the guarantors were not entitled to be released until the conditions of the agreement, made for their benefit, were carried out as written. Professor Williston, in his treatise on Contracts (1st Ed.), vol. 1, sec. 394, says the rule upon which the rights of third persons are founded, is as follows: "The foundation of any right the third person may have, whether he is a sole beneficiary or a creditor of the promisee, is the promisor's contract. Unless there is a valid contract no rights can arise in favor of any one. Moreover, the rights of the third person, like the rights of the promisee, must be limited by the terms of the promise. If that is in terms conditional, no one can acquire any rights under it unless the condition happens."

The Supreme Court of this State has announced the rule in substantially the same terms. In *Carson Pirie*

*Scott & Co. v. Parrett,* 346 Ill. 252, at p. 258, the court pointed out that the right of the third party benefited by a contract to sue thereon rests upon the liability of the promisor, ''and this liability must affirmatively appear from the language of the instrument when properly interpreted and construed. The liability so appearing can not be extended or enlarged on the ground, alone, that the situation and circumstances of the parties justify or demand further or other liability.''

Under the clear language of section 10, article 1, of the original plan of reorganization, which was made a part of the agreement of January 11, 1932, the guarantors were not to be released until new bonds providing for a sinking fund, to begin July 1, 1932, and the new guaranty, were duly executed and delivered to the depositing bondholders, and these conditions were never fulfilled. Defendants seek to escape from the provisions of the agreement of January 11, 1932, by arguing that the time specified for release of the old guarantors was the time of delivery of the new bonds and the new 100 per cent guaranty by Bendix, and that the substitution of ''old bonds, extended'' for ''new bonds,'' under the supplementary agreement of October 8, 1932, was in effect a consummation of the prior agreement of January 11th. They say that the supplementary agreement preserves every feature of the original agreement, excepting only the first five of nine semiannual sinking fund deposits of $80,000 each, leaving in force the four $80,000 deposits, beginning July 1, 1935, and that as against the cancellation of the five earlier sinking fund deposits, the bondholders had the benefit of reduction of the mortgage indebtedness from $1,440,000 to $1,402,500, and payment, or provision therefor, of all interest and carrying charges to and including January 1, 1933. Under the original plan Bendix was to pay, not only the defaulted interest coupons maturing January 1, 1932, and the sum of $160,000 to be used for purchase of bonds or certificates of deposit, but

also $720,000 to the sinking fund for bond retirements, and if the latter sum had been paid by Bendix as contemplated under the original plan the sinking fund would have reduced the principal of the outstanding bonds from $1,402,500 to $682,500. This was a substantial provision, made for the benefit of bondholders, and it was because of Bendix's inability or failure to comply with this provision that no new bonds were delivered to the depositary, that no personal guaranty of any such bonds was executed, and that the plan was not consummated. Thereafter, interest due, in excess of $40,000, was not paid July 1, 1932, and the entire principal remained in default. Under the original plan there was to be a new trust deed, with a new title guarantee policy, and there having been no one to assume liability for the bonds the new trust deed and title guarantee policy were not even considered. The guaranty of the bonds by Bendix under the original plan was not signed for the reason stated in his letter of June 15, 1932, that he could not meet the sinking fund obligations to be incorporated in the new bonds. All that Bendix did was to pay the interest January 1, 1932, and the sum of $160,000 to reduce the principal indebtedness. Nothing was done respecting the $1,402,500 of bonds which remained outstanding, and these remained in default subsequent to July 1, 1932. It thus seems clear that the condition precedent to the release of the guarantors was not fulfilled, and the plan was, in effect, then and there abandoned. The modified plan, which followed in October, 1932, was, in our opinion, a new and separate undertaking.

Defendants stress the resolution of the committee on April 15, 1932, wherein it was announced that the plan had become "effective" by reason of the deposit of $1,525,000 of bonds, under the terms of the depositary agreement of January 11, 1932, and the fulfillment of the conditions set forth in section 8 of article 1 thereof.

They say the condition was solely the issuance of new bonds, an obligation already unequivocally and unqualifiedly assumed by Bendix under the agreement, which was never abandoned but rather confirmed by the supplementary agreement of October 8, 1932, and that defendants and the other guarantors were at that time released. The trial judge evidently adopted this theory, because in his oral opinion he said: ''They got in over 90% of the bonds, and on about February 15th, I think it was, it was conditionally effective, and on May 23rd, they said it was finally effective, and that all that was to be done was to finish this by issuing of new bonds, and that they would release the old guarantors. That was a matter to be worked out by attorneys. . . .'' Manifestly the court was in error in finding that the committee had declared the plan finally effective May 23, 1932, because the minutes of the committee as of that date, showing the resolution adopted at the meeting, specifically refers to the conditions precedent to declaring the plan effective as set forth in section 8 of article 1 of the depositary agreement, and the preamble to the resolution, showing that substantially more than 90 per cent in amount of the outstanding bonds had been deposited, is followed by the resolution that the plan ''is declared effective.'' The resolution did not declare the plan *finally* effective, as the court said, but merely cited the precise section of the depositary agreement under which the committee was acting in making that declaration. Section 8 is not the section of article 1 which deals with the declaration of the plan *finally* effective. The declaration under section 8 is but preliminary and conditional. Section 10 of article 1 clearly provides that in the event the committee shall declare the plan effective ''as provided for in sec. 8 of Article 1,'' such declaration shall be conditioned upon the receipt of the new bonds by the depositary and the approval thereof by

the committee within such time thereafter as the committee, in its sole discretion, shall deem reasonable, and explicitly states that "the *plan shall not be deemed to be finally effective* until said bonds are so received and approved, and until that time the depositary shall not be deemed to have released any of their rights in the security of the trust deed dated January 1, 1929, or of the old guaranties." It therefore seems reasonably certain that the committee had in mind both sections 8 and 10 of article 1 when the resolution was drafted and passed.

It would seem that the court, in reaching its conclusion, also overlooked article X of the agreement of January 11, 1932, between the committee and Bendix, the principal guarantor. This article provides that "Promptly upon the delivery of the new bonds to the Depositary and the execution and delivery of said new guaranty to the Trustee under the Trust Deed, the Committee shall take such appropriate action as it shall be advised by its counsel it has the legal right to take to release the old Guarantors . . . ." It is conceded, of course, that neither the trustee, the bondholders' committee, nor the bondholders ever executed a release to any of the four defendants, nor did any of them ever request a formal release. The committee took no "appropriate action" with reference to the release of defendants, except to reaffirm that the guaranty by Bendix was not to be a substitution for the obligations of any other persons under existing guaranties and it was not until suits were instituted that the defenses of release were interposed.

Defendants further argue that they had a vested interest in the original plan, because Bendix had paid $160,000 April 15, 1932. However, the agreement of October 8, 1932, between the committee, Bendix, Miller and Uihlein, presented a modified plan which was founded upon this accomplished reduction in the out-

standing bonds, and the depositary agreement in section 10 of article 1 expressly provided for the contingency of abandonment of the original plan after payment of $160,000.

It is next urged that defendants were discharged as guarantors because the extension agreement, to which all the bonds were subjected, changed the terms of the primary contract in a manner adding to the obligations of the mortgagor. This contention is based upon a clause in the extension agreement which provides, in effect, that in the event of a failure to pay the interest on the bonds when due, in the manner set forth in the trust deed, or to perform all or any of the covenants therein contained, then the whole of the principal shall become due and payable, together with all accrued interest thereon, "in the same manner" as if an extension had not been granted, anything contained in the trust deed or the bonds to the contrary notwithstanding. It is argued, in other words, that the original trust deed called for interest at 6 per cent until maturity, and 7 per cent after maturity; that the extension agreement also provides that the bonds shall bear interest at 6 per cent prior to maturity, but that in the event of an interim default by the mortgagor the entire principal and all accrued interest shall become due and payable, "in the same manner as if said extension had not been granted, anything herein or in said bonds to the contrary notwithstanding"; and thus, under the original contract the accrual of interest at 7 per cent upon default prior to final maturity of the principal, depended upon acceleration and then ran only from the date of acceleration, whereas under the extension agreement the commencement of interest at 7 per cent, upon default, was automatic and related back to January 1, 1932. We think this contention is untenable, for the following reasons: The reasonable interpretation of the provision that the bonds could

be accelerated upon default and the interest rate increased to 7 per cent, "in the same manner," does not necessarily mean "payable in the same amount," but even if defendants' interpretation were to be adopted, nevertheless the original obligation was not enlarged beyond the authorization to extend as contained in the guaranty agreement. The trust deed provided for 6 per cent interest on the bonds up to January 1, 1932, and 7 per cent thereafter, and the extension agreement did nothing more than defer the obligation to pay any 7 per cent interest that had accrued to the time when default should occur with respect to the newly extended bonds and to project the principal obligors' liability to pay 7 per cent interest into the future. Moreover, plaintiffs claim interest at 7 per cent only from April 3, 1936, the date of acceleration, and this defendants admit. The law of suretyship is well settled that where a creditor expressly reserves his rights against the surety, at the same time that he agrees with the principal to an extension of the contract, or even to a release of the principal, the surety will not be released. (*Mueller v. Dobschuetz*, 89 Ill. 176; IV Williston on Contracts [Revised Ed.] sec. 1230.) The extended bonds in this proceeding, as well as the extension agreement, provided in effect that the liability of all other guarantors was expressly reserved.

The remaining contention urged in support of the judgment is that neither plaintiff has the requisite interest or capacity to maintain these suits. It must be conceded, of course, that City National Bank & Trust Company became successor trustee under the trust deed and bonds, and was therefore entitled to assert any rights and remedies thereunder as trustee on behalf of the bondholders. It is urged, however, that City National Bank & Trust Company did not become entitled to sue upon the guaranty because that instrument, considered separately and apart from the trust deed, contains no provisions for succession of trustee.

This contention overlooks the fact that the guaranty was executed contemporaneously with the execution of the bonds, and therefore constitutes an original obligation supplemental to and a part of the bonds. Although termed a guaranty, the instrument sued on is really a complete assumption of the principal debt, and constitutes the only personal liability upon that debt; in fact, the guarantors were the very persons who, through their trust, organized solely for this financing, obtained $1,600,000. It was therefore their obligation, and by means of the guaranty they kept their names off the bonds and appointed a trustee who acted for them without any personal liability. Thus, the obligation of the guarantors was the undertaking to pay their own debt, and they severally assumed liability for payment of the bonds and interest thereon and for carrying charges as provided by the trust deed.

There is also a sufficient showing of authority from the receiver of Central Republic Trust Company to join as coplaintiff. After a receiver was appointed for the Central Republic Trust Company, his right to join in the suit grew out of his duty to administer trusts before disposing of them. The law is now well settled in this State that the trust persists even though the bank be in receivership. We so held in *People ex rel. Barrett v. West Side Trust & Savings Bank,* 280 Ill. App. 308. Moreover, the defendants herein were not parties to the receivership proceedings, and therefore are not in position to question collaterally the receiver's conduct of his trust in an independent suit brought against them. (*People v. Dime Savings Bank,* 350 Ill. 503.)

Defendants contend in their brief, but did not press the point on oral argument, that plaintiffs' claim is excessive, in that they should not be entitled to recover from the guarantors for taxes accrued on the mortgaged real estate. They cite and rely on *Borker v.*

*Bendix,* 288 Ill. App. 260, where the plaintiff, as owner of a $500 bond, sued on the 100 per cent guaranty by Bendix, and recovered $500 plus $60 accrued interest at 6 per cent to January 1, 1935, plus 7 per cent interest on the $560 for approximately 13 months. No allowance was made on the claim for attorneys' fees. Defendants' counsel propound the inquiry, ''Could Borker also have recovered any part of the unpaid taxes?'' and they answer the inquiry by saying that he obviously could not, because the limit of his claim was the amount required to make him whole, namely, principal and interest on his bond. We think *Borker v. Bendix* is readily distinguishable from the case at bar, on the ground that Borker was there suing as a bondholder on his bond, whereas, in this proceeding, the trustee is suing on the trust deed, as extended, and defendants guaranteed both. The bond did not give Borker the right to sue for taxes accrued on mortgaged property, but the trust deed did itself give the trustee this right.

Holding as we do that plaintiffs are entitled to maintain this suit, that defendants have never been released from the obligations they assumed in their contract of guaranty, which was undoubtedly one of the principal inducements for the purchase of bonds by the investing public, and that the amount sought to be recovered is not excessive, the judgment of the superior court is reversed and the cause remanded with directions to enter judgment in favor of plaintiffs and against defendants for the amounts sued for, plus attorneys' fees, as provided in the instrument of guaranty, proof of which was expressly postponed until final determination of the case.

*Judgment reversed and cause remanded with directions.*

JOHN J. SULLIVAN and BURKE, JJ., concur.