CITIZENS STATE BANK OF COLMAN, Appellant, v. ROSENWALD, et al, Respondents.

(256 N. W. 264.)

(File No. 7580. Opinion filed September 17, 1934.)

*Rice & Rice,* of Flandreau, for Appellant.

*L. G. Atherton,* of Flandreau, for Respondents.

CAMPBELL, J.  November 24, 1925, H. A. Rosenwald and John Rosenwald, his brother, as makers, executed and delivered to

Citizens' State Bank of Colman their promissory note for $900, due August 1, 1926, with interest. Although both Rosenwalds were makers of the note and parties primarily liable upon the instrument (section 1893, R. C. 1919; section 192 U. N. I. L.), the fact was that the money represented by the note was advanced to H. A. Rosewald for his individual use and John Rosenwald was merely an accommodation maker, who, without receiving value, signed the instrument for the purpose of lending his credit to his brother, and, as between the two brothers, substantially the relation of principal and surety existed with reference to the indebtedness represented by the note. Of these facts the bank at all times had knowledge.

March 30, 1927, the bank took a renewal note signed by H. A. Rosenwald only, coming due September 1, 1927. John Rosenwald was not consulted with reference to such renewal note at or before its execution and had no knowledge thereof until some time thereafter when it was presented to him by the bank and he was requested to sign it, which he refused to do. The bank held this first renewal note signed by H. A. Rosenwald until after its maturity and on August 13, 1928, took a second renewal note signed by H. A. Rosenwald, due December 1, 1928, at which time the 1927 renewal note was canceled and returned to H. A. Rosenwald. Again John Rosenwald had no knowledge of the renewal until some time after it had been signed by his brother and given to the bank, when his signature was again requested and refused. The note of November 24, 1925, was at all times retained by the bank. When the first renewal note signed by H. A. Rosenwald alone was taken in 1927, the 1925 note was marked "collateral" and kept with it. When the second renewal note signed by H. A. Rosenwald alone was taken in 1928, the 1925 note still marked "collateral" was likewise retained with that.

The bank failed in 1930, having at that time among its assets the second renewal note of H. A. Rosenwald given in 1928 and with it and marked as collateral to it the note of 1925 signed by both the brothers. Plaintiffs are trustees of the assets of the insolvent bank for purposes of liquidation and in that capacity they instituted the present action against the two brothers to recover upon the note of November 24, 1925 (certain payments having been meantime credited thereon), the complaint, after alleging the ca-

pacity of plaintiffs, being in the usual form upon a promissory note. Defendant John Rosenwald admitted the execution of the note sued upon, pleaded the relation of principal and surety as between himself and his brother, alleged extension of time to his principal without his consent, and prayed that the action be dismissed as to him with costs. The action coming on for trial upon the issues so joined, the facts were developed by the evidence substantially as above outlined, and, at the close of all the testimony, each party moved for a directed verdict. The court directed a verdict in favor of plaintiffs against H. A. Rosenwald, but directed a verdict in favor of John Rosenwald for dismissal of the action with prejudice and with costs. From judgment entered accordingly in favor of defendant John Rosenwald, plaintiffs have now appealed.

The Uniform Negotiable Instruments Law was adopted in this state in 1913 (chapter 279, Laws 1913, now Rev. Code 1919, §§ 1705 to 1897). Section 1822, Rev Code 1919 (section 119, U. N. I. L.), specifies methods of discharge of persons primarily liable upon a negotiable instrument. The position of this court with relation to whether or not the methods set forth in that section for discharge of primary parties are exclusive has not always been consistent. See Wakonda State Bank v. Fairfield (1928) 53 S. D. 268, 220 N. W. 515; Commercial Nat. Bank v. Rich (1929) 54 S. D. 291, 223 N. W. 193; Smith v. Blackford (1929) 56 S. D. 360, 228 N. W. 466, 469. In the Blackford Case the court considered this question at some length and the judges deliberately and unanimously committed themselves to a view there summarized by the following language:

"The Negotiable Instruments Law thus adopted neither succeeded nor superseded the provisions of the Code relating to the discharge of a surety from liability by the creditor granting an extension of time to the principal debtor. Each stands upon equal footing with the other. It is the duty of this court to give effect to all parts of the Code, if that can be done. We think the provisions of section 1491 and section 1504, that a surety is discharged from liability by an extension of time granted by the creditor to the principal debtor without the consent of the surety, are not in conflict with a reasonable interpretation of the provisions of section 1822. We hold that a negotiable instrument is discharged as to

a surety by an extension of time granted to the principal without the surety's consent, and that such construction is authorized, in so far as a surety is concerned, by subdivision 4 of section 1822, which provides that the instrument is discharged by any act which will discharge a simple contract for the payment of money."

It is unfortunate that the Blackford Case failed to make any mention of the two prior decisions, and particularly unfortunate that the Blackford Case failed to cite and specifically overrule the Rich Case written by the same judge eleven months earlier announcing precisely the contrary rule. The holdings of the two cases are irreconcilable and the necessary result of the Blackford Case is to overrule the prior holding.

Appellant urges that the rule of the Blackford Case is distinctly a minority holding. This is true. See cases collected in notes 48 A. L. R. 715, 65 A. L. R. 1425. We recognized and stated in the Blackford Case that we were adopting a minority rule. We followed and adhered to it a few months later (Zastrow v. Knight [1930] 56 S. D. 554, 229 N. W. 925, 72 A. L. R. 379) and continue to believe that it represents a better view. See generally on the point, in addition to the annotations above cited, Brannan's Negotiable Instruments (5th Ed.) p. 883 et seq.; 12 Minn. Law Rev. 668; 17 Minn. Law Rev. 220; 26 Mich Law Rev. 929; 30 Harv. Law Rev. 141; 38 Harv. Law Rev. 954; 42 Harv. Law Rev. 136.

Appellant submits that the Rich Case and the Blackford Case can stand together, the holding of the latter being applicable only to a mortgage situation. We think not. If it be once conceded that the methods of discharge of primary parties specified by section 119, U. N. I. L., are not exclusive, and that the holder of a promissory note who has actual knowledge that the relationship between parties primarily liable thereon is in essence principal and surety will discharge the surety by conduct which would have discharged him prior to the Uniform Negotiable Instruments Law, then it seems to us entirely immaterial whether the suretyship relation has arisen because of a mortgage situation or in any other fashion whatsoever. If it is there and the note holder knows of it, it is not material how or why it originated.

Appellant next contends that the evidence in this case does not show a valid and binding extension of time by the bank to

the principal debtor, and, further, that, if there was a valid extension to the principal debtor, the surety is not thereby discharged because there was a reservation of right against the surety.

Before considering the evidence in the light of these two legal propositions, we must first determine the test to be applied thereto in this case. Appellant urges that since the verdict here was directed by the court against the plaintiff, judgment entered thereon should be reversed if, viewing the evidence and all inferences therefrom most favorably to plaintiff, it can be said that there would have been support for a verdict in plaintiff's favor had the jury found one. That may be deemed the proper general rule to test the propriety of granting a motion for directed verdict when made by one party. In the instant case, however, the verdict was directed in favor of the defendant John Rosenwald at the close of all the testimony and after both parties had moved for directed verdict without any reservation of right to go to the jury. When motions are thus made by both parties, the situation is entirely different from that which arises upon a single motion for directed verdict. There is, in substance, a submission by the parties of all questions of law and fact to the court and whatever decision the court makes with reference to the facts will be sustained unless the clear preponderance of the evidence is against it. This distinction is pointed out and the applicable rule reiterated in Sioux Nat. Bank v. Lundberg (1929) 54 S. D. 581, 223 N. W. 826. In the instant case, therefore, the test as to any fact question is this, "Does the evidence clearly perponderate against the finding of the trial judge in favor of defendant John Rosenwald implicit in the verdict directed?"

The transaction relating to the renewal notes, whereby respondent claims he was released from liability, was handled on the part of the payee bank by one Weiseth, the cashier and active managing officer of the bank at the time. There is no substantial conflict in the evidence as to what was done or said. From the testimony of Weiseth and the two Rosenwalds, the facts may be summarized about as follows: Weiseth in 1927 computed the amount due on the 1925 note (signed by both the brothers) and took a new note signed by H. A. Rosenwald. At that time H. A.. Rosenwald wanted the 1925 note returned to him. Weiseth told him that he could not have it until John had signed the renewal note. H. A.

Rosenwald said he did not want to have the two notes in the bank. So (in the words of Weiseth) "I marked this as collateral and it was really held as collateral to the new note. That was done at that time." Some time thereafter Weiseth asked John to sign the new note and he refused to do so "because he was getting so tired of signing notes with his brother." Whereupon Weiseth told John that the bank would hold the old note because that would be just as good as a new one, to which statement John made neither objection nor response. Substantially the same thing occurred when H. A. Rosenwald signed the second renewal note in 1928. In each case the renewal note was entered as the live asset of the bank and, testifying generally concerning the situation, Weiseth says that the 1925 note "was held by said bank as collateral to renewals and not as a direct or original asset of the bank after the acceptance of renewal notes by the bank. * * * The note in suit was held as a pledge of collateral security for the payment of said renewal notes until the maturity of said renewal notes."

It is clear law that the extension of time to a principal debtor which will discharge a surety must be a valid extension binding upon the creditor. Zastrow v. Knight (1930) 56 S. D. 554, 229 N. W. 925, 72 A. L. R. 379. Appellant argues that there was no such binding and valid extension of time to H. A. Rosenwald here, citing Kuhlman v. Leavens (1897) 5 Okl. 562, 50 P. 171. In the Kuhlman Case the court was able to find that the extension was granted subject to the assent of the sureties. In other words, the extension agreement was conditional and not enforceable by the principal debtor until the sureties consented. We do not think the facts here would bear such construction. Of course, the bank refused to surrender the 1925 note unless and until respondent signed the renewal note which H. A. Rosenwald had signed, but we find nothing in the evidence to indicate that the extension of time granted to H. A. Rosenwald by taking his renewal note was in any way conditional upon the consent of respondent thereto. The bank immediately entered said renewal notes on its books as an asset and marked the 1925 note as collateral thereto. There was no conditional acceptance of this renewal note. The case is even stronger as to the second renewal note because then the bank did exactly the same thing with the added knowledge that respondent had already once refused to sign a renewal note. So far as the

bank is concerned, we do not think, after accepting these renewal notes, that it could have maintained an action against H. A. Rosenwald prior to the maturity thereof either upon the renewal notes respectively or upon the 1925 note. The evidence in this record makes no case of conditional extension.

■ ■ Appellant next urges that even a valid and binding extension to the principal does not discharge the surety if at the time the creditor reserves his rights against the surety. This is undoubtedly sound doctrine. It is well stated in Stearns on Suretyship (3d Ed.) § 92, as follows:

"The reservation of the creditor's rights against the surety, when made a part of the contract of extension with the principal, results in a qualified extension merely. The creditor has bound himself not to proceed against the debtor until the maturity of the extension, but he has not changed his relations with the surety, since he has specifically reserved his right to sue him at once. This reservation of rights against the surety being a condition of the contract for extension entered into with the debtor, the latter impliedly assets that the surety may have all his original rights preserved against him as principal debtor, and although the creditor must forbear suit against the principal, yet the surety, if he pays the debt, may sue the principal at once. There is therefore no alteration of the surety's contract and no equitable reasons for urging his discharge."

This reservation of rights against the surety must be express and definite, however, and the creditor must not only retain the original instrument of indebtedness but must expressly reserve the right of immediate action thereon at least as against the surety. Appellant cites and relies on cases such as Merchants' Bank v. Bussell (1897) 16 Wash. 546, 48 P. 242; Miners' & Merchants' Bank v. Rogers (1907) 123 Mo. App. 569, 100 S. W. 534. In the Merchants' Bank Case the extension agreement specifically provided: "This agreement in no manner to interfere with an action upon said note against the other parties thereto." In the Miners' & Merchants' Bank Case the court says that there was evidence that the taking of the renewal note was agreed not to be an extension of time so as to interfere with the holder's right against the surety or indorser. According to all the evidence in the case now before us, the only right that the bank undertook to reserve against

respondent, as surety, was a right to proceed against him on the original note, not immediately and at any moment, but at the maturity of the renewal note if payment was not then made. This is not enough. The creditor cannot reserve a postponed or deferred right against the surety and the only reservation of rights against the surety which will prevent his discharge by a valid and binding extension of time to the principal without his consent is a clear and express reservation of an immediate and continuing right of action against the surety upon the original obligation. It is not material that the bank or the bank and H. A. Rosenwald may have believed that they could do what they did and still preserve a right to proceed against respondent on the 1925 note at the maturity of the renewal note if it was not then paid.

"The idea of the parties may have been that they could do this without releasing the sureties, and such may have been the positive agreement, yet, if the real transaction, as the evidence shows it to have been, was such as in law to discharge the sureties, the parties could not by agreement alter its legal effect, without the consent of the sureties." Templeman v. Texas Brewing Co. (1896, Tex. Civ. App.) 35 S. W. 935, 937.

We are convinced that the evidence in this case shows a valid and binding extension of time to H. A. Rosenwald, the principal debtor, without the consent of the surety and fails to show any such express reservation of immediate and continuing right against the surety as would prevent his discharge by such extension.

By way of precaution, it should be emphasized that the discharge of respondent in this case, by the taking of the renewal note, rests upon the fact that the taking of the renewal note constituted an extension of time and the discharge by extension of time in turn rests upon doctrines of suretyship, and the question here determined should not be confused with the somewhat closely analogous but broader question of whether or not a renewal note discharges the prior obligation as to signers who did not sign the renewal note absent the relationship of principal and surety between signers and non-signers and the creditor's knowledge thereof. Cf., note 52 A. L. R. 1416.

Finally appellant contends that Weiseth, as cashier of

the bank, would have no authority to release respondent from his liability on the 1925 note; that, if the taking of a renewal note from H. A. Rosenwald solely constituted a release of respondent, it was beyond the authority of the cashier since he could not do indirectly what he could not do directly, citing Michie, Banks and Banking (Perm. Ed.), vol IV, pp. 129, 130. In the instant case Weiseth, although nominally a cashier, was in fact, according to his own testimony, for over twenty years the sole active managing officer of Colman State Bank, apparently held out to the public by the bank and its directors as having authority to exercise general control over its business. Applicable to such situation the same text relied on by appellant states the rule as follows (Id., p. 101):

"In addition to the authority ordinarily inherent in his position, the cashier must be deemed to possess, as regards third persons, such other authority, if any, as he has been held out to possess. Thus if a cashier is allowed to exercise general authority in respect to the business of the bank for a considerable time— in other words, if he is held out to the public as having authority in the premises—the bank is bound by his acts, not ultra vires, as in case of an agent of any other corporation, by whatever name he may be designated, in the same manner as if authority were expressly granted."

It may be doubted whether this court has gone quite that far on the matter of the scope of authority of any general executive bank officer. See Mead v. Pettigrew (1899). 11 S. D. 529, 78 N. W. 945; First State Bank v. McMahon (1921) 45 S. D. 77, 185 N. W. 1014; Black Hills Trust & Savings Bank v. Stenger (1932) 59 S. D. 453, 240 N. W. 501, 86 A. L. R. 585. In this case, however, we need not undertake to decide the precise question of the authority of the officer. At the time of the taking of the first renewal note in 1927, the 1925 note was marked "collateral" and the renewal note was entered on the books of the bank as an asset of the bank. While it was so carried as an asset of the bank, at least two payments were made thereon, one in September, 1927, and another in December, 1927. When the second renewal note was taken in the fall of 1928, it was also listed on the books of the bank as an asset of the bank and in each instance the 1925 note indorsed across the face with the word "collateral" was kept with the renewal note which was carried as the live asset. Under those

circumstances, this situation having persisted for over three years, certainly it must be presumed that the directors of the bank had knowledge of what had been done in the premises and assented to and ratified the act of their managing officer regardless of any question of original authority in him. Under all the circumstances here appearing, we have no difficulty in holding that the bank was bound by the legal results which flow from the conduct of Weiseth with reference to the renewal notes involved in this action.

We find no error in the record, and the judgment appealed from is affirmed.

POLLEY and RUDOLPH, JJ., concur.

ROBERTS, P. J., concurs in the result.

WARREN, J., deeming himself disqualified, not sitting.