GRIFFIN WELLPOINT CORPORATION, Plaintiff, *v.* ENGELHARDT, INC., *et al.*, Defendants.—(PEABODY PETERSEN COMPANY *et al.*, Counterplaintiffs-Appellants, *v.* VULCAN MATERIALS COMPANY, Counterdefendant-Appellee.)

Second District   No. 79-164

Opinion filed December 26, 1980.

Arvey, Hodes, Costello & Burman, of Chicago, and George L. Siegel, Henry D. Fisher, Lawrence C. Rubin, and Ned L. Fisher, all of Hall, Meyer, Fisher, Holmberg, Snook & May, of Waukegan, for appellants.

Paul W. Gabler, of Chadwell, Kayser, Ruggles, McGee & Hastings, Ltd., of Chicago, for appellees.

Mr. JUSTICE LINDBERG delivered the opinion of the court:

This action was filed by Griffin Wellpoint Corporation (Griffin) seeking a mechanic's lien against public funds under section 23 of the Mechanics' Liens Act (Ill. Rev. Stat. 1977, ch. 82, par. 23) and for the entry of a judgment against certain parties including Peabody Petersen Company (Peabody) and Federal Insurance Company (Federal) predicated upon a contractor's bond given by Peabody as principal and Federal as surety under "An Act in relation to bonds of contractors entering into contracts for public construction" (Ill. Rev. Stat. 1977, ch. 29, pars. 15-16) to the North Shore Sanitary District (NSSD).

Griffin sought recovery for work done in connection with the construction of a sewage treatment plant known as the North Shore Sanitary District Waukegan Sewage Treatment Plant Additions Division P—3B overflow treatment facilities (treatment facilities). Peabody was the general contractor for the construction of the treatment facilities, and the principal on a contractor's bond. Federal was the surety on the contractor's bond. Griffin had allegedly provided the work pursuant to a contract with Engelhardt, Inc. (Engelhardt), which was a subcontractor of Peabody. Engelhardt was also named as a party defendant, but had become insolvent before the job had been completed. Engelhardt failed to complete its subcontract. Peabody was required to complete Engelhardt's subcontract and completed construction of the treatment facilities.

After Griffin filed its complaint, Peabody and Federal filed a counterclaim in this action, joining as parties any other persons, firms, or corporations which might have an interest in the funds which were the subject matter of Griffin's complaint, or who might allege that they had a claim on the contractor's bond. Vulcan Materials Company (Vulcan) was one of approximately 30 parties which were joined in this action. Vulcan had also filed its own action in the Circuit Court of Cook County entitled Vulcan Materials Company v. Peabody Petersen Company, et al., No. 74 CH 1932. That action was transferred from Cook County to Lake County, and consolidated with this cause.

Vulcan filed a counterclaim in this action claiming that it was owed the sum of $267,509.79 for materials such as gravel and concrete mix which it allegedly provided to Engelhardt in connection with construction of the treatment facilities. In count I of its counterclaim Vulcan claimed a lien in the amount which it alleged was owed to it by Engelhardt against public funds which were held by the North Shore Sanitary District (NSSD), and which were due to Peabody under its contract with the NSSD. Vulcan also prayed in count II for a judgment against Peabody and Federal under the contractor's bond given by Peabody and Federal as required by "An

Act in relation to bonds of contractors entering into contracts for public construction" (Ill. Rev. Stat. 1977, ch. 29, pars. 15-16). Peabody and Federal filed an answer denying liability on Vulcan's claim.

Subsequently, Vulcan filed a motion for summary judgment on count II of its counterclaim, which sought relief under the contractor's bond. An order was entered granting Vulcan summary judgment in the amount of $267,227.42 plus $60,693.58 in interest against Peabody and Federal. The court found that there was no just reason to delay the enforcement or appeal from that order. A motion for reconsideration was denied. Thereafter, a notice of appeal was filed by Peabody and Federal.

The various documents and attachments to the motions filed in the trial court reveal the following facts.

On or about May 11, 1972, Peabody entered into a general contract with the NSSD for the construction of the Waukegan Sewage Treatment Plant Additions Division P—3B overflow treatment facilities (treatment facilities). Peabody was to do all of the work and provide all of the labor, materials, equipment and appurtenances for the construction of the treatment facilities for the sum of $4,579,261.35. On or about that same date, Peabody, as principal, and Federal, as surety, gave a contractor's bond to the NSSD. The bond was for the penal sum of $4,579,261.35, and contained obligations relating to performance of the contract and the payment of certain obligations under the contract.

Peabody entered into a subcontract with Engelhardt, which was a general contractor located in Mundelein, Illinois. Under its subcontract, Engelhardt was to perform certain work relative to the construction of the treatment facilities for the sum of $4,134,261.35.

After Peabody and Engelhardt had entered into their subcontract, Engelhardt began its portion of the construction project. Engelhardt hired a variety of subcontractors and materialmen to furnish labor, materials, equipment and other services in connection with the construction of the treatment facilities. One of those materialmen was Vulcan.

As construction went forward, Peabody paid Engelhardt, predicated on monthly pay estimates which it furnished to Peabody. These included all of the work and materials which Engelhardt had incorporated into the project for the period in question, including the labor and materials furnished to Engelhardt by its subcontractors and materialmen including Vulcan.

During construction of the NSSD job, certain change orders were authorized. In addition, the amount of the contract was increased because certain of the items in the contract were on a per unit basis, and the amount of units exceeded the original estimate. As a result of the change orders and increase in the unit items, Engelhardt's subcontract was increased to $4,777,704.02. The total sum of the NSSD contract with Peabody was increased to $5,224,655.40.

In October 1973, Peabody refused to advance additional funds to Engelhardt, apparently because it discovered that Engelhardt had failed to pay its subcontractors and materialmen. Subsequently, Engelhardt was unable to complete the job. Engelhardt sent a notice to its creditors advising that it was insolvent, could not pay its bills, and was out of business. Peabody was required to complete the NSSD job. It has paid a total of about $4,200,000 to Engelhardt. In addition, it paid about the sum of $662,000 to other persons, firms, and corporations to complete Engelhardt's subcontract. Accordingly, the cost to Peabody on the work which Engelhardt was required to perform is about $54,000 in excess of the price for which Engelhardt agreed to do the work under its subcontract. This is exclusive of the claim of Vulcan, which is the subject of this appeal.

The first major area of dispute among the parties to this appeal is Vulcan's financial relationship with the subcontractor, Engelhardt. In the documents and testimony developed through discovery, it appears that Engelhardt was in debt to Vulcan for materials supplied on prior jobs at the time the NSSD construction began. The record shows that Engelhardt was often unable to pay invoices due within 30 days of shipment, and that Vulcan did not insist on or demand prompt payment. While construction was continuing on the NSSD job, Engelhardt executed two promissory notes which in part represented amounts past due on invoices for materials supplied on the NSSD job. The first note was executed on March 1, 1973, and was in the face amount of about $307,000; the second, executed on June 1, 1973, was in the face amount of about $33,000. (Two other such notes were executed by Engelhardt to Vulcan in the year 1972, but these notes represented amounts past due on jobs other than the NSSD project, and hence are not relevant here.) There is also evidence in the record that Vulcan took no steps to notify either Peabody or Federal that Engelhardt had executed either of the two notes.

The second major dispute among the parties relates to the method used by Vulcan in applying payments made by Engelhardt to indebtedness on the NSSD job and on other jobs for which it had supplied materials. The complexity of the financial dealings between Engelhardt and Peabody, and, in turn, between Engelhardt and Vulcan, prevents a comprehensive recitation of the number and amount of payments among the parties for the calendar years 1972-1973. However, the following salient facts may be briefly noted:

During the period from July 1972 to December 1973 materials having a total value of about $385,000 were sold by Vulcan to Engelhardt for the NSSD project and were to be delivered to the job site.

Both prior to and during the period when Vulcan was selling materials to Engelhardt for the NSSD job, Vulcan was also selling materials to Engelhardt for other jobs, some of which were public works projects.

After Vulcan had first sold materials for the NSSD project, the total amount of all payments made by Engelhardt to Vulcan was $332,000. The total amount of payments made by Peabody to Engelhardt in connection with the project, which aggregated about $4,200,000, was deposited in a single checking account during the period from July 1972 to October 1973. During this period, deposits and withdrawals in this account from all sources aggregated more than $10,000,000.

On the basis of a first-in, first-out tracing of funds through Engelhardt's checking account, the portion of the $332,000 paid by Engelhardt to Vulcan which was derived from the payments received by Engelhardt on the NSSD project amounted to $77,000.

It is also undisputed that Vulcan applied payments received by Engelhardt according to the instructions made by Engelhardt at the time of, or subsequent to, the time of payment; if no directions or instructions were received, Vulcan applied the payment to the oldest unpaid invoice first. Vulcan's application of $118,000 to NSSD job invoices results in about $267,000, being the balance due to Vulcan for materials sold to Engelhardt for the NSSD job.

During the course of the proceedings below, a motion was filed to strike the affirmative defense of Peabody and Federal that they were not liable under the contractor's bond. The defense asserted that neither Peabody or Federal had any further liability because Peabody had already made payments in excess of the penal sum of the bond in connection with the construction of the treatment facilities. The court granted the motion to strike. The court found that the fact that Peabody had made these payments was irrelevant to its liability under the bond, and that these payments by Peabody did not discharge its liability of that of Federal under the bond.

Thereafter, Vulcan filed a motion for summary judgment as to count II of its counterclaim. Peabody filed a response which asserted that there were genuine issues of material fact as to (1) whether Vulcan's extensions of credit prejudiced Peabody, and thereby discharged Peabody and Federal under the bond, (2) whether Vulcan's method of applying payments which it received from Engelhardt resulted in Vulcan making a claim for invoices on the NSSD job to which prior payments should have been applied.

After receiving briefs, reviewing various depositions, and affidavits, the court granted Vulcan's motion for summary judgment in the amount of $267,227.42. The trial court also awarded prejudgment interest to Vulcan in the sum of $60,693.58. A motion for reconsideration of the order granting summary judgment and prejudgment interest was filed with additional affidavits. That motion was denied, and this appeal followed.

## I.

Peabody and Federal first argue that they were both discharged from further liability under the bond because Peabody has made payments in amounts exceeding the penal sum of the bond to various firms and corporations during the course of construction of the treatment facilities plant. Specifically, they note that the performance bond in this case was in the penal sum of $4,500,000. They assert that, because Peabody made payments exceeding that sum to various firms, persons, and corporations in connection with the NSSD construction project, they are now discharged from further liability on the bond.

We disagree. This argument plainly confuses the extent of liability upon a performance bond, with the extent of liability in the event of nonperformance of the underlying obligation which has been guaranteed by the bond. The former is clearly limited by the penal sum (*United Mail Order, Warehouse & Retail Employees Union, Local 20 v. Montgomery Ward & Co.* (1956), 9 Ill. 2d 101, 137 N.E.2d 47, *cert. denied* (1957), 352 U.S. 1002, 1 L. Ed. 2d 546, 77 S. Ct. 558); the latter may or may not be, depending upon the contract of the parties. For instance, if Peabody's obligation under the prime contract with the NSSD were to expend the fixed sum of $4,500,000 (the penal amount) in the construction of the treatment facilities plant, payment by Peabody towards the completion of the construction project would reduce *pro tanto* the potential liability of the surety, Federal, in the event of Peabody's nonperformance. But in the case at bar, the liability on the bond was not co-extensive with the performance of the underlying obligation which was guaranteed by the bond. Pursuant to its contract with the NSSD, Peabody was obligated to expend whatever sum was necessary to pay for all labor and materials supplied for the project. The mere fact that Peabody had to spend more than $4,500,000 to complete the job does not discharge either the surety or principal from further liability upon the bond. Hence, the principal and surety are not discharged from further liability upon the bond merely because the principal made payments in the course of construction which exceeded the penal sum of the bond.

It is axiomatic that the liability of the principal and surety on their bond obligation depends on the provisions of the bond itself. The bond in this case provided, in pertinent part, that the obligation thereunder would remain in full force and effect unless the principal shall "promptly pay all debts incurred by the contractor or any subcontractor in the prosecution of such work, including those for labor and materials furnished * * *" and shall "pay any and all valid claims for labor and materials furnished in carrying out and performing said contracts by the above bounden Contractor or any subcontractor or in attempting to do so * * *." The per-

formance of the principal which was guaranteed by the bond is measured by the foregoing provisions, not by the bond's penal amount. The contract price, which in this case was the same as the penal sum on the bond, is the measure of what the general contractor-principal was to receive as compensation from the NSSD upon the prime contract, not a measure of what the general contractor was to expend in carrying out its obligations under the contract. We thus find no merit to the surety's and principal's contentions in this regard.

The cases relied upon by the surety and principal do not aid their argument. (*E.g., Humphreys v. Leggett* (1850), 50 U.S. (9 How.) 297, 13 L. Ed. 145; *Maryland Casualty Co. v. Alford* (10th Cir. 1940), 111 F.2d 388; *United States v. Maryland Casualty Co.* (D. Md. 1955), 129 F. Supp. 45; *Monmouth Lumber Co. v. Indemnity Insurance Co.* (1956), 21 N.J. 439, 122 A.2d 604.) In general, these cases pertain to admittedly valid claims in an amount certain, or claims which had been reduced to an enforceable money judgment against the principal by the judgment creditor. In each case, the court held that the surety's liability under the bond was limited to the penal amount on the bond where multiple claims by creditors exceeded the penal sum. Although we agree with the reasoning of the courts in these cases, we find that they do not govern the situation before us.

■■ In sum, we hold that, where the liability of the principal and surety upon a bond is not co-extensive with the principal's objections under its underlying contract, payments made by the principal in satisfaction of the underlying obligation on a performance bond, which exceed the penal sum on the bond, do not serve to discharge the surety and principal from further liability.

## II.

Peabody and Federal next argue that the trial court erred in granting Vulcan's motion for summary judgment because a genuine issue of material fact existed as to whether Peabody was prejudiced by Vulcan's extension of credit to Engelhardt, and that prejudice, if proven, would discharge both Peabody and Federal from further liability upon the bond. It is apparently undisputed that Vulcan accepted two promissory notes from Engelhardt which in part represented amounts past due on invoices issued by Vulcan to Engelhardt for materials furnished on the NSSD job. The first note, dated March 1, 1973, was in the face amount of about $307,000; the second, dated June 1, 1973, was in the face amount of about $33,000.

Vulcan contends that neither Peabody nor Federal was discharged by any extension of time given by Vulcan to Engelhardt, and that no question of fact existed in this case. It argues initially that the March 1,

1973, note did not constitute an extension of credit in any form to Engelhardt. It also argues that any one of five reasons exist for denying the relief sought by Peabody and Federal on this appeal: (1) any extension was given to a stranger on the bond, Engelhardt, and did not vary the terms of the original agreement; and thus does not discharge the principal and surety from liability upon the bond; (2) the extension could not serve to discharge the surety or principal on the bond because its duration did not extend later than the deadline for the creditor to bring suit against the principal on the bond; (3) the surety was not prejudiced by the extension; (4) Vulcan explicitly reserved its rights against the surety in the extension agreement; and (5) the surety consented to any extension of time in its bond agreement, and hence is not discharged. Vulcan contends that any one of these reasons is a complete and independent ground for ruling that neither Peabody nor Federal has been discharged from its liability upon the bond.

■■ We will first address Vulcan's preliminary contention that the first note given to Engelhardt did not constitute an extension of time which would serve to discharge the surety or principal in their obligation upon the bond.

The record shows that this note given by Engelhardt was in the face amount of about $307,000, and was payable on demand. Periodic payments of principal and interest were provided for but the entire balance was due once a demand was made.

We agree with Vulcan that this note did not constitute a binding extension of time to the debtor which could extinguish the surety's liability on the bond. A demand note given by the debtor to the creditor merely represents the creditor's indulgence or forebearance in seeking collection or performance of the debt. It does not constitute a binding extension of time for payment which would serve to excuse a surety on a performance bond because the creditor may demand payment or performance at any time. See 74 Am. Jur. 2d *Suretyship* §60 (1974); *Farmers' State Bank v. Fausett* (1926), 54 N.D. 696, 210 N.W. 638.

Similarly, Engelhardt's failure to pay invoices for materials within 30 days of the billing date, and Vulcan's failure to insist upon payment, does not constitute the grant of an extension of time to pay by the creditor to the debtor that would serve to extinguish a surety's liability on a bond. Failure to demand prompt payment is merely an indulgence by the creditor, not a binding extension of credit.

The only question remaining, then, is the effect to be given the second note, dated June 1, 1973, which was given by Engelhardt to Vulcan, and which was in the face amount of about $33,000. Of the five factors previously cited to us by Vulcan, we find at least one to be dispositive of the issue raised by Peabody and Federal. We hold that

Peabody and Federal are not discharged from liability under the bond because Vulcan explicitly reserved rights against the surety or sureties when it granted an extension to the subcontractor, Engelhardt, to pay its debts on past due invoices.

■■■ It is well-established law that a creditor's grant of an extension of time for the principal to perform a bonded obligation may release the surety from its obligation upon the bond, if the extension was granted without the surety's consent. (*Price v. Dime Savings Bank* (1888), 124 Ill. 317, 15 N.E. 754; *Anschell v. Flynn* (1930), 256 Ill. App. 230.) However, where a creditor expressly reserves his rights against the surety at the same time he agrees with the principal to an extension of time or time for payment on a contract (or even to a release of the principal), the surety will not be released from his obligation upon the bond. (*Mueller v. Dobschuetz* (1878), 89 Ill. 176; *City National Bank & Trust Co. v. Burnham* (1938), 297 Ill. App. 211, 17 N.E.2d 505.) The June 1 note[1] contained the following language:

> "This Note is not given in discharge of any indebtedness of the undersigned or any of them to Vulcan Materials Company, and the latter's acceptance of this Note and the mortgage referred to below shall not impair or affect any lien rights, bond rights, or other rights remedies which it may have against any property or any other party with respect to said indebtedness."

This is a clear and unambiguous reservation of rights against any surety. Because Vulcan explicitly reserved its rights against the surety when it entered into the extension agreement, Peabody and Federal are not discharged from any obligation upon the bond.

Federal and Peabody both acknowledge the existence of the "reservation of rights" doctrine, but deny its applicability under the circumstances presented in the case at bar. They contend that a "reservation of rights" by the creditor is effective only if the surety had notice of and consented to the extension. In support of this argument, they rely principally on a 52-year-old decision of this court, *Albee v. Gross* (1928), 250 Ill. App. 98.

In *Albee*, the plaintiff was an owner of land which he sold to the defendant Gross, who executed a trust deed and a note to pay for the property. The defendant sold the property to another person, Brandt, subject to the trust deed and note. Brandt, in turn, sold the property to Allen who agreed to pay the note when due. At the time payment was due, Allen was the owner of the land originally sold to Gross. Allen was unable to pay and obtained an extension of time without notice to either Brandt or Gross. After the extension period had expired, Allen remained unable to pay the obligation. A suit for foreclosure was thereafter filed by

---

[1] The March 1 note also contained similar language.

the plaintiff, who prayed for a deficiency judgment against Gross and Brandt. This court ruled that Brandt and Gross were sureties for Allen's debt, and were discharged by the extension granted to Allen without their consent.

This court further held that the extension discharged them notwithstanding language in the extension agreement, which provided that "all of the provisions, stipulations, powers and covenants in the principal note and trust deed shall stand and remain unchanged." The interpretation to be given this part of the holding in *Albee* is disputed by the parties. Peabody and Federal argue that the above-mentioned language constituted a "reservation of rights," which was held ineffective due to a lack of notice or consent by the sureties. On the other hand, Vulcan contends that this language did not amount to a reservation of rights, and that the quoted language meant only that the extension agreement was not intended to amend any of the terms of the pre-existing contract.

We believe Vulcan's view of this case is correct. The language cited by the *Albee* court does not seem to constitute a reservation of rights, nor did the court rely on, or attempt to distinguish the leading Illinois Supreme Court cases which adhered to the reservation of rights doctrine. (*E.g., Dupee v. Blake* (1893), 148 Ill. 453; *Mueller v. Dobschuetz.*) Although the *Albee* opinion has been cited in later decisions, it has never been relied upon for the proposition that Peabody and Federal urge. (See, *e.g., Metz v. Dionne* (1928), 250 Ill. App. 369; *Douglass v. Ullsperger* (1929), 251 Ill. App. 145; *Binga v. Bell* (1930), 259 Ill. App. 361; *Farmers & Merchants Bank v. Narvid* (1931), 259 Ill. App. 554; see also *Prudential Insurance Co. of America v. Bass* (1934), 357 Ill. 72, 191 N.E. 284, *aff'd* (1934), 274 Ill. App. 76 (*Albee* found controlling by appellate court, but not cited by the supreme court).) Thus, we cannot accept Federal's and Peabody's contention that the *Albee* decision is controlling in this case.

Peabody and Federal also contend that other jurisdictions that have considered the question have required notice to, or consent by, the surety before giving effect to a reservation of rights clause. (*E.g., Jordan Marsh Co. v. Collins* (1926), 254 Mass. 356, 150 N.E. 202; *Robson v. Brown* (Tex. Civ. App. 1900), 57 S.W. 83, *aff'd* (1900), 57 S.W. 686; *Maier v. Thorman* (Tex. Civ. App. 1921), 234 S.W. 239; *Citizens' State Bank v. Rosenwald* (1934), 63 S.D. 50, 256 N.W. 264.) However, other courts have held to the contrary, as Vulcan has noted. *Meredith v. Dibrell* (1913), 127 Tenn. 387, 155 S.W. 163; *Boston National Bank v. Jose* (1894), 10 Wash. 185, 38 P. 1026.

■■ There seems to be no particular requirement under Illinois law that notice be given to the surety or that the surety consent to the extension of time before a reservation of rights clause will be given effect. (See, *e.g., Dupee.*) Nor does the Restatement of Security require such notice or

consent. (Restatement of Security §129 (1), (2) (1941).) We thus hold that no notice or consent to the surety is required before a "reservation of rights" clause will be held effective. Finding no question of material fact relating to the extensions of credit given by Vulcan to Engelhardt, we hold that the trial court did not err in granting summary judgment to Vulcan on this issue.

### III.

Peabody and Federal next argue that the trial court erred in granting summary judgment because a genuine issue of material fact existed as to whether Vulcan prejudiced the rights of Peabody by its method of applying payments which it received from Engelhardt to invoices on other projects, or to past indebtedness, rather than to invoices on the NSSD job. (*E.g., Alexander Lumber Co. v. Aetna Accident & Liability Co.* (1921), 296 Ill. 500, 129 N.E. 871.) We again disagree.

The most basic rule of cash application, as expressed in the case of *Liese v. Hentze* (1927), 326 Ill. 633, 158 N.E. 428, is that "the debtor may control the application of payments made on his account, and if he does not do so the creditor may apply where he chooses." As the court noted in *Village of Winfield v. Reliance Insurance Co.* (1965), 64 Ill. App. 2d 253, 258, 212 N.E.2d 10, 12, where the debtor does not indicate the application of a particular payment, the court will ordinarily apply it to the first item due.

In the case at bar, Engelhardt ordinarily gave instructions for application of its payments to certain accounts. Where no such instructions were received, Vulcan applied the payment to the oldest invoice first.

We find no particular injustice in the manner and method in which Vulcan applied payments made by Engelhardt for materials supplied on the NSSD and other projects in this case. It should be pointed out that, of the amounts deposited in Engelhardt's checking account during the relevant period, only 40% of those funds were attributable to payments made by Peabody on the NSSD job. The first-in, first-out analysis of Engelhardt's account which was conducted by Vulcan revealed that, of the total payments made by Engelhardt to Vulcan during the NSSD construction, only about $77,000 of the $332,000 were traceable to funds transferred to Engelhardt on the NSSD job. In fact, Vulcan applied a much larger amount (about $117,000) to Engelhardt invoices on the NSSD job, or about 35% of the total amount of cash received from Engelhardt.

The use of the first-in, first-out method of tracing funds has been specifically approved by this court in the case of *Village of Winfield v. Reliance Insurance Co.* (1965), 64 Ill. App. 2d 253, 258, 212 N.E.2d 10, 12-13, where we stated that:

"The first-in, first-out principle, is one of the rules of law which

determines the ordinary application of voluntary payments or withdrawals when the parties have made no application for themselves and the circumstances of the case do not require a different application. The rule will not be applied where it produces an unjust result."

The first-in, first-out analysis prepared by Vulcan in this case indicated that a reasonable proportion of the payments made by Engelhardt to Vulcan were derived from funds paid on the NSSD job. This contrasts markedly with the situation presented to the court in *Alexander Lumber Co. v. Aetna Accident & Liability Co.* (1921), 296 Ill. 500, 129 N.E. 871, where the supreme court found that although substantial amounts of payments made to a creditor by the debtor were derived from funds paid to the debtor on a particular job, virtually none of those funds were applied by the creditor to invoices on that job. In those circumstances, the court held that, under general equitable principles, the creditor may not look to the debtor's surety for payment of debts incurred upon the job. Such is not the case here. Indeed, this case is factually more akin to *Village of Winfield v. Reliance Insurance Co.*, where substantial amounts of payments made to the creditor were shown to have been derived from other sources.

In sum, we find that no question of fact existed on the issue of Vulcan's application of payments received from Engelhardt, and accordingly hold that the trial court did not err in granting summary judgment on this issue.

IV.

We next address the question of whether the trial court erred in awarding prejudgment interest in the amount of about $60,000 to Vulcan. The trial court awarded interest from the date Vulcan made a demand upon the surety, Federal, for payments of the amounts due from Engelhardt for materials supplied on the NSSD job.

The order allowing interest was based upon section 2 of the Interest Act (Ill. Rev. Stat. 1977, ch. 74, par. 2), which provides for the payment to creditors of interest at the rate of 5% per annum on "all moneys after they become due on any bond, bill, promissory note, or other instrument of writing."

■■ Vulcan contends that the absence of specified due date for payment in the bond is fatal to Vulcan's claim for prejudgment interest. We disagree. The authorities are clear that where the subject matter of the underlying obligation on the bond carried with it an inherent due date, prejudgment interest may be granted by the court. As was said in the case of *Reserve Insurance Co. v. General Insurance Co. of America* (1979), 77 Ill. App. 3d 272, 283, 395 N.E.2d 933, 940-41:

"* * * interest has been allowed from the date of the commencement of suits on judgments obtained for the breach of construction performance bonds which were conditioned upon prompt payment of amounts due persons supplying labor and materials to the defaulting principals. (See *United States v. Illinois Surety Co.* (7th Cir. 1915), 226 F. 653, *aff'd sub nom. Illinois Surety Co. v. John Davis Co.* (1917), 244 U.S. 376, 61 L. Ed. 1206, 37 S. Ct. 614; *National Surety Co. v. McCormick* (7th Cir. 1920), 268 F. 185; *County of Will v. Woodhill Enterprises, Inc.* (1971), 4 Ill. App. 3d 68, 274 N.E.2d 476.) In light of the need for the continuance of construction upon the principal's default, the surety could be deemed to have given its bond with the knowledge that its liability would accrue upon the date of the principal's default."

We thus find no error in the trial court's allowance of prejudgment interest in the case at bar. We do agree, however, that interest should have been allowed only from the date that the suit was commenced. See *Reserve Insurance Co. v. General Insurance Co. of America* (1979), 77 Ill. App. 3d 272, 395 N.E.2d 933; *County of Will v. Woodhill Enterprises, Inc.* (1971), 4 Ill. App. 3d 68, 274 N.E.2d 476.

For the reasons stated, the judgment of the Circuit Court of Lake County in granting summary judgment to Vulcan Materials Company is affirmed; the order awarding Vulcan prejudgment interest is reversed, and this cause is remanded to the court below with directions to recompute the interest owed from the date of the filing of this suit by Vulcan, and to enter judgment thereafter accordingly.

Affirmed in part, reversed in part, and remanded.

SEIDENFELD, P. J., and WOODWARD, J., concur.