THE DEPARTMENT OF TRANSPORTATION *ex rel.* MOLINE CON-
SUMERS COMPANY, Plaintiff-Appellant and Cross-Appellee, v. AMERI-
CAN INSURANCE COMPANY, Defendant-Appellee and Cross-Appellant.

Third District No. 3—89—0390

Opinion filed July 6, 1990.

Joseph F. Fackel, of Van Hooreweghe, Fackel & Thuline, of Moline, and Linn C. Goldsmith, of Boyle, Goldsmith, Shore & Bolin, of Hennepin (Walter Durley Boyle, of counsel), for appellant.

Mohan, Alewelt, Prillaman & Adami, of Springfield (Paul E. Adami, of counsel), for appellee.

JUSTICE SCOTT delivered the opinion of the court:

Plaintiff, Moline Consumers Company, is a partially unpaid ($51,678.24) supplier of a subcontractor on a public project. Defendant, the American Insurance Company, is the surety upon the performance and payment bond. After a bench trial, judgment was entered for plaintiff in the amount of $16,024.62, without interest. The trial judge disallowed $35,653.62 of the amount admittedly due plaintiff from the subcontractor on the theory that plaintiff had prejudiced the surety, passing up an opportunity to intercept that amount out of the stream of payments from the contractor to the subcontractor. Plaintiff appeals. We reverse this determination, as well as that part of the judgment below denying interest. Defendant, as assignee of the subcontractor, cross-appeals from the judgment below denying its counterclaim based upon a brief delay by plaintiff in having material available for the project. That part of the judgment below is affirmed. The facts follow.

In March of 1984, S.J. Groves & Sons Company (Groves) was awarded a contract by the Illinois Department of Transportation (IDOT) to prepare a road bed in advance of paving work on State Route 34 between Galesburg and Monmouth in Warren County, Illinois. The American Insurance Company (American) was surety on the bond ($6,944,147.23) required by section 1 of the contracts for public works statute (Ill. Rev. Stat. 1987, ch. 29, par. 15). That statute requires the principal (Groves) and the surety (American) to agree, among other things, that the just claims of suppliers to sub-

contractors will be paid. For an extensive discussion of this statutory provision, see *Housing Authority ex rel. Smith-Alsop Paint & Varnish Co. v. Holtzman* (1970), 120 Ill. App. 2d 226, 235-40, 256 N.E.2d 873, 877-80; see also *Decatur Housing Authority v. Christy-Foltz, Inc.* (1983), 117 Ill. App. 3d 1077, 1079, 454 N.E.2d 379, 383.

In early May of 1984, Groves employed Robert Harris, d/b/a Harris Construction (Harris), to furnish rock and porous granular material for the project. Harris, as a disadvantaged, or minority, enterprise, met certain State of Illinois requirements enabling Groves to go forward with the work. About this same time, Groves loaned Harris $15,500 for start-up expenses.

In late May of 1984, Harris issued a purchase order to plaintiff, Moline Consumers Company (Moline), of a little over $1 million for the purchase of rock and porous granular material.

The work began. Moline had a stockpile of stone, rock, and granular material. Harris supplied trucks and drivers. Each week Groves, Harris and Moline would reconcile the amount of material that had been delivered to the jobsite. Each month Moline would bill Harris, Harris would bill Groves, who, in turn, would bill IDOT. Moline expected its invoices to be paid within 30 days of the date of billing. There was no written agreement between Harris and Moline other than a description on the purchase order of price and quantities. The billing statements from Moline to Harris included advice that interest at the rate of 18% per annum was payable on past-due accounts.

There was a period of a little over two weeks around October 1984 when IDOT representatives halted delivery of rock for having too many "fines," small pieces. Moline took steps to cure this problem and deliveries resumed. During this time, Harris had a separate subcontract to put up fence along the right-of-way on the interstate that was being built.

Later in 1984, and more acutely in 1985, the Harris payments to Moline were delayed and past-due invoices accumulated. Groves responded to a Moline complaint by setting up a meeting between Groves, Harris and Moline for Saturday morning, September 21, 1985, in Monmouth. Harris had been assisted throughout the project by James Schuster, an attorney with expertise in the representation of minority business enterprises, and he attended the meeting on behalf of Harris. No other lawyers were present. Groves came to the meeting with a check payable to Harris for about $129,000, the amount Groves then owed Harris, and sought to have Harris and Moline agree on how it would be divided. Harris suggested that Moline have $50,000, at the most, $60,000. Moline responded that it

was owed about $94,000 by Harris via past-due invoices and should be paid at least that amount. Additionally, about a week before this meeting, Moline had billed Harris $111,696.14, due October 13, 1985, for rock furnished in August and through September 5.

Groves advised the other parties that the amount it owed Harris by reason of the last Moline billing ($111,696.14) would only be a little over $68,000, hence there would be a shortfall of over $43,000, even if Moline took the whole $129,000. Apparently, at this time Harris needed some $20,000 to keep its workers' compensation insurance in force and, absent a substantial payment, would go out of business entirely.

At trial, the Moline representative denied ever actually seeing the check. A Groves witness stated it had been exhibited to all parties. The Groves representative viewed his obligation as only to make payments to Harris because Groves had no contractual relationship with Moline. A memorandum of what happened at this meeting prepared by Groves, dated September 23, 1985, states that the check for a little over $129,000 payable to Harris was given to the Harris accountant with an understanding that Harris would issue a check for about $94,000 to Moline the following Monday, September 23, 1985; that, in fact, was done.

The Groves representative testified at trial that he urged Moline to take the whole check although that version of the meeting does not appear in the above Groves memorandum prepared contemporaneously with the transaction. Moline's position is that it could not have insisted on taking more than the approximate $94,000 paid after the meeting because the above invoice for $111,696.14 recited on its face that it wasn't due until October 13.

The Groves memorandum of September 23, 1985, includes a statement that everyone understood that Groves would closely monitor future payments to insure that all monies due from Harris to Moline would be paid. Other sources of funds that might be available to Harris discussed on September 21, 1985, included the fence-building project and utilization of Harris' equity in the trucks for bank financing. It is unclear whether Moline knew in the fall of 1985 that Groves had loaned Harris over $15,000 for start-up expenses and that the sum would be deducted at the end from amounts paid by Groves to Harris.

By December of 1985, it was apparent that Harris would lose money on the whole project, including the fence work; further, there would be no bank financing. On December 20, 1985, the Harris attorney wrote to Moline advising that they would continue to try and ar-

range financing in order to pay Moline "the money that is currently owed." Harris also directed Groves to make future checks due Harris payable to both Harris and Moline.

Harris did not mention in the September meeting, or at any other time prior to litigation, any claim of offset, or counterclaim, against Moline attributable to the approximate two-week stoppage of rock hauling in October 1984.

Groves next cancelled the subcontract with Harris, Moline attempted to enforce a mechanic's lien and Harris went through a chapter 7 bankruptcy. Moline's mechanic's lien action failed because by then Groves owed no money to Harris. Moline then filed the instant action against American based upon the bond described above.

American asserted as an affirmative defense that the failure of Moline to take the whole $129,113.43 on September 21, 1985, was prejudicial to it, that it should be given a credit for the $35,653.62 difference ($129,113.43 less $93,459.81 equals $35,653.62). Additionally, after obtaining an assignment of a claim of damages for the work stoppage in October 1984 from Harris, American counterclaimed for a setoff of about $17,000. The trial judge disallowed American's counterclaim but allowed its affirmative defense. Judgment was entered for Moline in the amount of $16,024.62, without interest.

The issue is whether Moline's conduct at the September 21, 1985, meeting may be treated as "affirmative action" operating to the prejudice of American. In *People v. Whittemore* (1912), 253 Ill. 378, the court stated:

> "All that a surety has a right to require of his creditor *** is, that no affirmative act shall be done that will operate to his prejudice." (*People v. Whittemore* (1912), 253 Ill. 378, 382.)

In *Griffin Wellpoint Corp. v. Engelhardt, Inc.* (1980), 92 Ill. App. 3d 252, 414 N.E.2d 941, a supplier did not insist on or demand prompt payment of invoices; it accepted a note and extended the time of payment, the note reciting a reservation of rights in favor of the supplier. The surety had no notice of any of these matters; its argument that it should be released *pro rata* was rejected.

■ The law is well settled that a supplier in Moline's position who gives a lien waiver is later precluded, to the extent of the waiver, from being paid by the surety on the bond obligation. (*William Aupperle & Sons, Inc. v. American Indemnity Co.* (1979), 75 Ill. App. 3d 722, 394 N.E.2d 725.) In *Alexander Lumber Co. v. Aetna Accident & Liability Co.* (1921), 296 Ill. 500, the principal issue was whether a lumber company seeking to recover on the bond

of the building contractor could apply payments received on earlier indebtedness involving other projects. However, as an additional basis for its decision, the court pointed out that the lumber company, having gone to Springfield for the purpose of filing a lien, refrained for a time from doing so at the request of a bank. This "affirmative" action by the creditor resulted in a *pro rata* credit in favor of the surety. The statement made by the court:

"[W]here a creditor releases or permits to be lost a security for a debt, other sureties are thereby released to that extent." *Alexander Lumber Co. v. Aetna Accident & Liability Co.* (1921), 296 Ill. 500, 509.

The argument of Moline is that it only achieved payment of almost $94,000 through hard bargaining during the September 21, 1985 conference. Groves made no unconditional offer of the $129,000 to Moline. It is of some significance that in December of 1985, Harris agreed to the inclusion of Moline's name on any future checks from Groves to Harris. It is also apparent that even if Moline had been given the whole $129,000, there would still have been a shortfall of about $43,000 attributable to Moline's invoice of $111,696.14, due October 13, 1985. Accordingly, the maximum "credit" that might have been given American was only about $8,000. We are unable to fault Moline's conduct at the September 21, 1985, meeting.

We turn next to American's counterclaim. All of the rock and porous granular material supplied by Moline to Harris was accepted. Although an IDOT inspection resulted in a delay in rock hauling for about two weeks, IDOT didn't require that rock previously delivered be removed or not utilized. The initial purchase order by Harris to Moline is silent as to what might happen if there were a delay in the availability of rock. Nothing in the conduct of these parties in 1984 and 1985 suggests that Moline had any inkling that Harris might assert any offset against Moline attributable to the October 1984 delay. Only after litigation did Harris counterclaim on the theory that Harris drivers and equipment sat idle for over two weeks. The only significant evidence offered on the counterclaim was deposition testimony of the Harris attorney that he did an earlier computation respecting losses in gross revenue attributable to the idle time based on telephone reports to him by his client. Notes of the attorney and the records of Harris had been lost at the time of the trial. The trial judge was of the view that Harris had been damaged but he had no way of ascertaining how much. Equally important is the circumstance that in September and December of 1985, Harris unconditionally acknowledged its obligation to Moline without

any reference to offset or counterclaim. The judgment of the court below dismissing American's counterclaim must be affirmed.

■■ ■ Section 2 of the Interest Act (Ill. Rev. Stat. 1987, ch. 17, par. 6402) states that creditors shall be allowed interest at 5% per annum for all monies due on any bond or other writing or on a settlement of accounts. The statute is clearly applicable. Here the amount due, $51,678.24, was never in dispute except for the above affirmative defense and counterclaim. It is sufficient that this is a suit on a bond and that the money is due. (*County of Will v. Woodhill Enterprises, Inc.* (1971), 4 Ill. App. 3d 68, 274 N.E.2d 476; *Capital Development Board ex rel. P.J. Gallas Electrical Contractors, Inc. v. G.A. Rafel & Co.* (1986), 143 Ill. App. 3d 553, 493 N.E.2d 348.) In *Griffin Wellpoint Corp. v. Engelhardt, Inc.* (1980), 92 Ill. App. 3d 252, 414 N.E.2d 941, the court required that prejudgment interest accrue only from the date the action was commenced. Here that would be July 1, 1986. See also *Bigelow-Liptak Corp. v. Mazzucco Construction Co.* (1972), 4 Ill. App. 3d 90, 280 N.E.2d 276.

Moline is entitled to interest at 5% per annum on $51,678.24 computed from July 1, 1986, until the entry of judgment. This cause is remanded with instructions to enter a judgment for the correct amount owing, namely $51,678.24, plus interest. The judgment below draws interest at the rate required by section 2—1303 of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 2—1303). Interest on the judgment as increased will be computed from the date of filing this opinion. *Owens v. Stokoe* (1988), 170 Ill. App. 3d 179, 524 N.E.2d 755.

Reversed in part; affirmed in part and remanded.

BARRY and STOUDER, JJ., concur.